IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.      5:20-cr-00298-DNH |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN ZOURDOS,** | ) | |
| **HELEN ZOURDOS, and** | ) | |
| **DIMITRIOS ZOURDOS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## TRIAL MEMORANDUM OF THE UNITED STATES

Undersigned counsel for the United States hereby submits the government's trial memorandum in the above-referenced matter.

DAVID A HUBBERT
Acting Assistant Attorney General

/s/ John N. Kane, Jr.

_____

By:  JOHN N. KANE, JR.
Assistant Chief
U.S. Department of Justice, Tax Division
Northern Criminal Enforcement Section
Bar Roll No. 515130

CARLA B. FREEDMAN
United States Attorney

/s/ Michael F. Perry

_____

By:  MICHAEL F. PERRY
Assistant United States Attorney
Bar Roll No. 518952

# **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ........................................................................... 1

II.    SUMMARY OF INDICTMENT ......................................................................... 2

III.   RECIPROCAL DISCOVERY AND AFFIRMATIVE DEFENSES ..................... 3

IV.    GOVERNING LAW ......................................................................................... 3

V.     SUMMARY OF ANTICIPATED EVIDENCE .................................................. 8

VI.    LEGAL AND EVIDENTIARY ISSUES ........................................................... 18

    a.    Admissibility of Tax Records ................................................................... 18

    b.    Defendants' Statements Offered by the Government Are Admissible ............. 19

    c.    Defendants' Statements Offered by the Defendant Are Not Admissible ......... 20

    d.    Stipulations ............................................................................................. 21

    e.    Admissibility of Business Records ............................................................ 21

    f.    Summary Charts and Testimony from Agents ............................................. 22

    g.    Admissibility of Other Act Evidence Under Rule 404(b) .............................. 24

    h.    Admissibility of Lifestyle Spending to Prove Income and Willfulness .......... 25

    i.    Admissibility of Testimony by IRS Revenue Agent Performing Tax Computations as a
       Summary Witness – Not Expert Witness ..................................................... 27

    j.    Defendants May Not Confuse the Jury With Improper References To Civil and
       Administrative Civil Remedies .................................................................. 29

    k.    Defendants May Not Invite Jury Nullification through References to Punishment or Other
       Improper References ................................................................................ 311

    l.    Leading Questions Are Allowed for Hostile Witnesses ................................. 33

    m.   Case Agent and Revenue Agent as Exceptions To Sequestration Rule .......... 344

    n.    Sequestration of Individual A .................................................................... 36

    o.    Defendant's Expert Disclosures ................................................................. 36

VII.   CONCLUSION ............................................................................................... 37

## I.   **PRELIMINARY STATEMENT**

a.  Trial is scheduled to begin in Utica, New York, on November 1, 2021.

b.  The defendants, John Zourdos, Helen Zourdos, and Dimitrios Zourdos, are on pretrial release.

c.  A jury trial has not been waived.

d.  The government estimates that its case-in-chief will take approximately 6 days and that the entire duration of the trial will be approximately 8.5 days.[1]

e.  The government is represented by Assistant Chief John N. Kane, U.S. Department of Justice, Tax Division, and Assistant United States Attorney Michael F. Perry.

f.  Defendants John and Helen Zourdos are represented by David Garvin.  Defendant Dimitrios Zourdos is represented by Gabriel Nugent.

g.  On October 7, 2020, a Northern District of New York grand jury sitting in Syracuse, New York, returned an indictment charging John, Helen, and Dimitrios Zourdos with one count of conspiring to defraud the United States with respect to corporate and individual income tax, and payroll taxes in violation of 18 U.S.C. § 371; four counts of tax evasion with respect to the income taxes of John and Helen Zourdos in violation of 26 U.S.C. § 7201; three counts of tax evasion with respect to the income taxes of Dimitrios Zourdos in violation of 26 U.S.C. § 7201; and seven counts of aiding and assisting in the filing of false and fraudulent corporate income tax returns in violation of 26 U.S.C. § 7206(2).

---

[1]  This estimate assumes that jury selection will take less than one full court day.

## II.   **SUMMARY OF INDICTMENT**

Count 1 of the indictment charges all three defendants with conspiring with one another, and with others known and unknown to the grand jury, from in or about 2013 through and including in or about 2017, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the functions of the IRS in the ascertainment, computation, assessment, and collection of individual income tax, corporate income tax, and employment taxes – all in violation of Title 18, United States Code, Section 371.

Counts 2 through 5 of the indictment charge all three defendants with tax evasion, and the aiding and abetting thereof, with respect to the individual income taxes of defendants John and Helen Zourdos, for the tax years 2013 through 2016, in violation of Title 26, United States Code, Section 7201 and 18 U.S.C. § 2.

Counts 6 through 8 of the indictment charge all three defendants with tax evasion, and the aiding and abetting thereof, with respect to the individual income taxes of defendant Dimitrios Zourdos, for the tax years 2014 through 2016, in violation of Title 26, United States Code, Section 7201 and 18 U.S.C. § 2.

Counts 9 through 15 of the indictment charge all three defendants with aiding and assisting in the preparation and filing of false and fraudulent corporate income tax returns for HZ Dippin and RDZ Dippin, for the tax years 2013 through 2016, in violation of Title 26, United States Code, Section 7206(2).

## III.   RECIPROCAL DISCOVERY AND AFFIRMATIVE DEFENSES

The government has requested reciprocal discovery from the defense. Defendants Helen and John Zourdos produced discovery material in August 2021. Defendant Dimitrios Zourdos has not produced any discovery to the government.

The defendants have not given notice of their intent to rely on any defense of entrapment, mental incapacity, duress, or alibi. Therefore, to the extent the defendants may attempt to rely on any such defenses, the government reserves the right to object and to seek to have the defendants precluded from asserting such defenses.

## IV.   GOVERNING LAW

### Count 1:  Conspiracy to Defraud the United States (18 U.S.C. § 371)

The government must prove the following elements beyond a reasonable doubt to establish a violation of 18 U.S.C. § 371: (1) an agreement among two or more persons, the object of which was to defraud the United States; (2) the defendant's knowing and intentional joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the alleged co-conspirators.  *See United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003).

To establish a conspiracy in violation of 18 U.S.C. § 371, the government need not present evidence of a "formal or express" conspiratorial agreement:

> The government may prove its existence by circumstantial evidence, provided such evidence establishes beyond a reasonable doubt the defendants' knowledge of the essential nature of the plan and their connections with it. The government need not prove that the defendants knew the details of the conspiratorial scheme or the identities of all of the conspirators.

*United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002) (cleaned up) (quoting *United States v. Amato*, 15 F.3d 230, 235 (2d Cir. 1994)).

Here, the agreement between the defendants can be established circumstantially through the coordination and uniformity of their conduct. The evidence ties all three defendants to the cash payments to employees, the diverted cash deposits into personal accounts, and the maintenance of the proverbial "second set of books" – calendar sales notebooks containing a record of true sales, which the defendants failed to give to their accountant.  Helen admitted to the cash payroll during an interview with agents.  Both John and Helen met repeatedly with the tax preparer, but they did not disclose their diversion of cash receipts to personal accounts.

The overt acts in this conspiracy were numerous and include making cash deposits to personal accounts; paying for luxury items in cash; paying a portion of their payroll under the table in cash; and filing (and causing to be filed) false corporate and individual returns.

### Counts 2 through 8: Tax Evasion (26 U.S.C. § 7201)

To convict the defendants of tax evasion for each tax year pursuant to 26 U.S.C. § 7201, the government would need to prove the following elements beyond a reasonable doubt for each tax year and count:

(1)     Defendants engaged in at least one "affirmative act" constituting an attempt to evade or defeat a tax;
(2)     Defendants in fact had an additional tax due and owing for that year; and
(3)     Willfulness.

*See Sansone v. United States*, 380 U.S. 343, 351 (1965); *Spies v. United States*, 317 U.S. 492, 497-99 (1943); *Cheek v. United States*, 498 U.S. 192, 193 (1991).

An "affirmative act," generally, for tax evasion purposes, is "any conduct, the likely effect of which would be to mislead or to conceal." *Spies*, 317 U.S. at 499; *see, e.g.*, *United States v. Bishop*, 264 F.3d 535, 545 (5th Cir. 2001).  The Supreme Court "by way of illustration, and not

by way of limitation," set out examples of what can constitute an "affirmative willful attempt" to evade, in the *Spies* case:

> [K]eeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.

317 U.S. at 499. Even an activity that would otherwise be legal can constitute an affirmative act supporting a Section 7201 conviction, so long as the defendant commits the act with the intent to evade tax. *See United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir. 1996). Classic examples of affirmative acts constituting attempts to evade and defeat tax include the filing of false returns, keeping a double set of books, and making extensive use of cash – precisely the kinds of affirmative acts alleged here.

With respect to proving a tax due and owing, it is not necessary to charge or prove the exact amount of the tax that is due and owing. *United States v. Bishop*, 264 F.3d 535, 550-52 (5th Cir. 2001); *United States v. Thompson*, 806 F.2d 1332, 1335-36 (7th Cir. 1986); *United States v. Harrold*, 796 F.2d 1275, 1278 (10th Cir. 1986); *United States v. Citron*, 783 F.2d 307, 314-15 (2d Cir. 1986); *United States v. Buckner*, 610 F.2d 570, 573-74 (9th Cir. 1979); *United States v. Marcus*, 401 F.2d 563, 565 (2d Cir. 1968). It is enough to prove that a defendant attempted to evade a substantial income tax even though the actual amount of tax that he or she owes may be greater or less than the amount charged in the criminal case. Whether the amount due is "substantial" is a jury question. *United States v. Davenport*, 824 F.2d 1511, 1516-17 (7th Cir. 1987) ($3,358.68 in taxes evaded sufficient to support taxpayer's conviction).

5

As well, the tax deficiency at issue need not be for taxes due and owing by the defendant; the deficiency may be for taxes due and owing by another taxpayer. One may attempt to evade the assessment or payment of taxes of another, or aid and abet the evasion of someone else's taxes. *See United States v. Wilson*, 118 F.3d 228, 231, 236 (4th Cir. 1997) (attorney convicted of attempting to evade a client's taxes); *United States v. Townsend*, 31 F.3d 262, 264, 266-67 (5th Cir. 1994) (motor fuels excise tax owed by someone other than defendant).

Each defendant is charged in the indictment with seven counts of tax evasion in violation of section 7201, corresponding to the individual income tax liabilities for John and Helen Zourdos for tax years 2013 to 2016 and the individual income tax liabilities for Dimitrios Zourdos for tax years 2014 to 2016. The government expects the trial evidence to show that the defendants attempted to evade the assessment of these liabilities by causing their tax preparer to file false individual and corporate income tax returns concealing the Dippin Donuts stores' true cash receipts and the defendants' true income from the stores; depositing cash receipts from the stores into their personal bank accounts instead of the stores' designated business bank accounts; paying personal expenses in cash; and providing false, misleading, and incomplete information to their tax preparer.

An IRS Revenue Agent will appear as a witness and compute additional tax due and owing on each of John and Helen Zourdos's returns from 2013 to 2016, and on each of Dimitrios Zourdos's returns from 2014 to 2016. For purposes of computing the additional tax due and owing, the IRS will attribute to the defendants as unreported income the total amount of cash deposited to their personal bank accounts during the tax years charged in the indictment.  As well, the revenue agent will compute additional unreported income to John and Helen Zourdos based on the calendar "sales" notebooks that recorded true sales.

The evidence of willfulness with respect to the Section 7201 charges will be substantial. On a basic level, the individual returns underreport the defendants' income by substantial amounts, especially when compared to the small amount of wages they were paying themselves. That the defendants put themselves on the official payroll and paid themselves small amounts through this method suggests that they were intentionally concealing the cash deposits they made into their personal accounts, since they simply could have increased their own wages instead. The evidence will show that the defendants purchased numerous luxury items, including multiple high end luxury vehicles (i.e., multiple Porsches); a Rolex watch John purchased with $21,000 in cash; and a vintage 1963 Ford vehicle Dimitrios restored with $30,500 in cash. These and other luxury purchases suggest the defendants intentionally underreported their income, in part so that the IRS would not know their donut and coffee stores were substantially more profitable than they were reporting.

**Counts 9 through 15: Aiding/Assisting in the Filing of False Returns (26 U.S.C. § 7206(2))**

To convict a defendant of aiding and assisting in the preparation and filing of false returns, in violation of 26 U.S.C. § 7206(2), the government would need to prove the following elements beyond a reasonable doubt:

(1)    the defendant aided or assisted in, procured, counseled, or advised the preparation or presentation of a document in connection with a matter arising under the internal revenue laws;

(2)    the document was false as to a material matter; and

(3)    the defendant acted willfully.

*United States v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001).  Willfulness "generally connotes a voluntary, intentional violation of a known legal duty." *United States v. Bishop*, 412 U.S. 346, 360 (1973); *see also Cheek v. United States*, 498 U.S. 192, 200 (1991); *United States v. Ervasti*, 201 F.3d 1029, 1041 (8th Cir. 2000).

7

Section 7206(2), typically used to charge tax return preparers, may also be used to charge the underlying named taxpayers, particularly in circumstances where, as here, the defendants provided false or incomplete information to a third party tax return preparer, who in turn prepares and files the return with authorization from the taxpayers. *United States v. Hirschfeld*, 964 F.2d 318 (4th Cir. 1992); *United States v. Dean*, 64 F.3d 660, 1995 WL 493006 (4th Cir. 1995) (unpublished); *United States v. Greger*, 716 F.2d 1275 (9th Cir. 1983), *cert. denied*, 465 U.S. 1007 (1984).

Here, each of the defendants assisted in the preparation of the false corporate returns. Helen and John did so most directly by interfacing with return preparers, providing incomplete information and withholding information concerning total sales, and signing the returns that underreported the stores' true gross receipts. Dimitrios also willfully aided and assisted in the filing of false corporate returns by diverting a substantial portion of the stores' true gross receipts into personal bank accounts, thus aiding in concealing them from the defendants' tax preparer.

When voluntarily interviewed by agents, John stated that Gilroy computed gross receipts by tallying the deposits on the business bank accounts. Because John knew Gilroy only reviewed the business bank accounts to prepare the corporate returns, he knew diverting gross receipts into the personal bank accounts—which Gilroy did not review—would cause false corporate returns to be filed. Dimitrios knew his tax returns reflected only his wages reported on his Forms W-2, not the cash deposits in his personal accounts.

**V.   SUMMARY OF ANTICIPATED EVIDENCE**

In brief, the government anticipates its evidence at trial will prove the following:

John Zourdos and his wife Helen Zourdos own and operate Dippin Donuts, a chain of three donut stores, located in Rome and New Hartford, New York. The corporate names of the three

8

stores are:  HZ Dippin, located at 1169 Erie Boulevard in West Rome, New York; RDZ Dippin, located at 1941 Black River Boulevard in Rome, New York; and ERD Dippin, located at 8483 Seneca Turnpike in New Hartford, New York.

Defendants John and Helen managed the stores with their adult son Dimitrios and, from time to time, someone identified in this memorandum as Individual A.  Between 2013 and 2017, John, Helen, and Dimitrios conspired to conceal approximately two million dollars in cash receipts from the stores by diverting the cash receipts away from the stores' designated business bank accounts – and into their personal bank accounts. The Zourdoses were able to conceal the diverted cash receipts by providing their tax preparer business bank account statements and checks; they did not provide any other record of total sales, such as personal bank account statements and deposit details, cash register "z" tapes, or the calendar "sales" notebooks they had been keeping to track their true sales. As a result, the Zourdoses caused their tax preparer to file false individual and corporate tax returns that failed to report the stores' true receipts and the defendants' true income.

In addition, the Zourdoses conspired to operate an "off the books" cash payroll, paying overtime hours directly in cash without any withholdings while paying regular hours "on the books" using a payroll servicer, there causing the payroll servicer to file false employment tax returns that underreported the wages paid.  Some employees, namely the bakers, were paid in cash completely "off the books."   At times, the Zourdoses would have employees "clock out" even though the employees kept working, which meant that these employees' time cards did not reflect all the hours they worked.  In operating an "off the books" cash payroll, the Zourdoses were able to evade federal employment taxes, as New York labor laws require time-an-a-half wages for

overtime such that paying those overtime wages under the table in cash fraudulently shifted the cost of overtime to the United States Treasury.

The evidence in this case consists, among other things, of tax returns showing the low wages and total income that the defendants reported; bank records for the Zourdoses' personal accounts and the stores' business accounts; testimony from the tax preparer about what he received and did not receive from the defendants to prepare the false returns; testimony from the employees about the cash payroll; and evidence obtained from search warrants conducted at the stores and at the personal residence of John and Helen Zourdos, including the calendar sales books the Zourdoses maintained recording the stores' true sales.

Search warrant evidence will also show that the Helen and John Zourdos horded approximately $300,000 in undeposited cash at their residence, mostly in larger bills, suggesting the exchange of smaller bills generated from the sales at their stores.

<u>Tax Records</u>:  The evidence will show that each of the three donut stores – HZ Dippin, RDZ Dippin, and ERD Dippin – filed corporate tax returns reporting gross receipts and sales dramatically lower than the receipts and sales they actually received.   In addition, the tax records will show that each of the defendants filed individual tax returns on Forms 1040 reporting extraordinarily low wages and total income utterly at odds with their lavish lifestyle, unreported cash deposits to their personal accounts, and the information the defendants themselves told financial institutions and other third parties about their much higher income when applying for credit.  The evidence will show that Helen and John reported the following wages, total income, and tax during the years charged in the Indictment:

| Tax Return Item | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Wages/Salary: John Zourdos | $10,050.00 | $36,850.00 | $32,200.00 | $31,200.00 |
| Wages/Salary: Helen Zourdos | $16,950.00 | $22,000.00 | $24,500.00 | $26,000.00 |
| **Total Wages/Salaries** | **$27,000.00** | **$58,850.00** | **$56,700.00** | **$57,200.00** |
| **Total Income** | $46,377.00 | $91,994.00 | -$33,774.00 | $58,407.00 |
| **Taxable Income** | $10,601.00 | $56,637.00 | $8,000.00 | $23,661.00 |
| **Total Tax** | $1,453.00 | $3,165.00 | $0.00 | $1,624.00 |

Similarly, Dimitrios reported *de minimis* wages, total income, and tax:

| Tax Return Item | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Wages/Salary | $12,350.00 | $16,950.00 | $21,250.00 | $20,800.00 |
| **Total Income** | $19,722.00 | $55,409.00 | $25,838.00 | $24,010.00 |
| **Taxable Income** | $2,764.00 | $36,972.00 | $6,325.00 | $6,320.00 |
| **Total Tax** | $0.00 | $3,376.00 | $343.00 | $0.00 |

The evidence will show that these reported figures are substantially at odds with the defendants' lavish lifestyle that included substantial unencumbered real estate, numerous luxury vehicles, annual summer vacations to Greece, expensive jewelry and clothes, frequent spending at high-end retail outlets, and investment accounts at Morgan Stanley with substantial holdings.  The evidence will also show the reported figures are also substantially at odds with diverted unreported sales and receipts that the defendants deposited into their personal accounts, and with the

representations of their income the defendants made to multiple third parties in the context of various credit applications.

Bank Records. Each of the three donut stores maintains its own business bank account. John and Helen Zourdos serve as signatories on each of the business bank accounts. The evidence will show that the deposit activity in each business bank account reconciles to the total gross receipts reported on each respective store's tax return.

During a voluntary interview conducted special agents with the IRS, Helen Zourdos falsely stated that all business receipts were deposited into the business bank accounts.

The deposit activity in the Zourdoses' *personal* bank accounts reveals Helen's false statements. While the Zourdoses' personal accounts did receive a small amount in payroll checks and third-party checks, the bulk of the deposits into the accounts were in cash.  Agents totaled the cash deposits into personal accounts belonging to John and Helen, and separately into personal accounts belonging to Dimitrios. The cash deposits dwarf the wages John, Helen, and Dimitrios reported on their returns. The cash deposited into their personal accounts as compared to the wages reported on their returns is as follows:[2]

| Tax Year | Cash Deposits into John and Helen's Accounts[3] | Combined Dippin Donuts Wages per Tax Return |
|---|---|---|
| 2013 | $390,248.00 | $27,000.00 |
| 2014 | $302,158.00 | $58,850.00 |

---

[2]  A substantial amount in cash, representing addition unreported store receipts, was also deposited into personal bank accounts belonging to Individual A.

[3]  A review of the business banks accounts shows that none of the cash deposits into the personal accounts came from cash withdrawals from the business bank accounts.

12

| Tax Year | Cash Deposits into John and Helen's Accounts[3] | Combined Dippin Donuts Wages per Tax Return |
|---|---|---|
| 2015 | $138,898.90 | $56,700.00 |
| 2016 | $148,071.85 | $57,200.00 |
| Total | $979,376.75 | $199,750.00 |

| Tax Year | Cash Deposits into Dimitrios' Accounts | Dippin Donuts Wages per Tax Return |
|---|---|---|
| 2013 | $41,924.76 | $12,350.00 |
| 2014 | $39,023.62 | $16,950.00 |
| 2015 | $72,723.34 | $21,250.00 |
| 2016 | $57,066.87 | $20,800.00 |
| Total | $210,738.59 | $71,350.00 |

Tax Preparer. The government's theory of prosecution is that more than $1.1 million in cash deposited into the defendants' personal accounts represents cash receipts diverted from the stores and concealed from the IRS through the filing of false individual and corporate returns that did not report these additional cash receipts.

The defendants' accountant and his assistant prepared the corporate income tax returns for the three stores. They prepared these returns based on the business bank account statement that John and Helen Zourdos provided. The Zourdoses *did not* provide any statements and deposit details from personal bank accounts. This evidence is corroborated by the correspondence between the deposit activity in the business bank accounts and the amounts of gross receipts reported on

the returns, the testimony of the accountant and his assistant, and their production of records, including QuickBooks records showing the use of business bank account statements to compute totals sales.  John Zourdos told the accountant that he deposits all the business receipts into the business bank accounts.

The accountant also prepared individual returns for John and Helen, who file jointly, and Dimitrios, who files separately. The low wages from Dippin Donuts reported on the returns correspond to the Forms W-2 the defendants received from the stores' payroll servicer.

The accountant is expected to testify that John and/or Helen Zourdos would review the completed corporate returns with him or his assistant and that the personal returns were always sent to John and Helen.  When conducting the review, the accountant would ask if they reported all their income, and John and/or Helen Zourdos would respond in the affirmative. The accountant would also ask if they reported all their business income, to which they would also respond in the affirmative.

Search Warrant. Search warrants were executed at the Dippin Donuts stores and at John and Helen's personal residence. Agents seized calendar-style notebooks from each store, which record total daily sales, broken down into drive-thru versus counter sales and credit card versus cash sales.

According to employees, each store had a drive-thru register and a counter register, and both registers were closed out twice a day at noon and at closing. When an employee closed out a register, the register summary (or z-tape) showing total sales from the register would be printed. The employee was supposed to put the z-tape in the register drawer and place the register drawer with the z-tape and the cash in the back office for the defendants to count and deposit.

Review of the notebooks kept in the stores reveals that the defendants used the notebooks to record the stores' true total sales and the portion of the cash sales that were deposited into the designated business bank account.[4] Accordingly, the notebooks also reveal the portion of the sales that were not deposited into the designated business bank account – and, instead diverted to the defendants' personal accounts or horded at their residence for personal use.  Below is an example of an entry made by John Zourdos from the HZ Dippin notebook for August 10, 2015:



In the above example, the numbers on the left reflect drive-thru ("DT") versus counter ("C") sales during the first half of the day (before the first register closeout) and the second half of the day (before the second register closeout).  The evidence will show that the numbers on the left when totaled together reflect total sales for the day, in this case, $2,615.64.

It would be expected that the numbers on the right would reflect the same total sales of $2,615.64, just broken into cash versus credit card instead of drive thru versus counter. In fact, however, the numbers on the right (here and more generally) do *not* equal the numbers on the left: here, the numbers on the right total only $1,940.72, reflecting an unaccounted-for $674.92. Agents have reviewed the notebooks and will offer summary exhibits showing the upper-right numbers

---

[4]  It should be noted that based on the notebooks, the defendants appear to have only skimmed cash from the RDZ and HZ stores. Multiple employees stated that ERD was the least profitable of the stores and was more or less breaking even.

(here, $1,483.15) consistently equal cash deposits made into the business bank accounts one to two days following a notebook entry. For example, here, a cash deposit of $1,483.05 was made into HZ Dippin's bank account on August 11, 2015, a day later. The bottom-right numbers, in turn, correlate to the credit card deposits, which were made in batch settlement payments from Dippin Donuts' credit card merchant processors.

As another example, Helen recorded the following for sales on April 1, 2015, for HZ Dippin:



To the left, Helen recorded true total sales for the day (counter and drive through) totaling $3,208. To the right, credit card sales of $727.95 are recorded.  In the middle, $1,442, the amount of the cash deposited to the business account.  The cash deposit and credit card deposits total $2,169.95, leaving more than $1,000 in undeposited cash that the defendants skimmed and concealed from the IRS.

And on July 7, 2015, Dimitrios carried out the same scheme to skim:



On the left, Dimitrios records $3,087 in total sales for the day.  On the right, $624.32 in credit card deposits, and in the middle, $1,225 in cash deposits to the business account – leaving unaccounted-for approximately $1,238 in skimmed cash for the day.

Given the expected employee testimony and the corroboration from business bank account statements, the government will establish at trial that the numbers on the left reflect true receipts, the numbers on the right reflect the receipts hitting the business bank account, and that the difference between the right and the left represents the receipts skimmed and not disclosed to the defendants' accountant or the IRS.

As well, during the search warrant the government seized from John and Helen's personal residence just under $300,000 in cash. This cash, along with employee testimony as to the cash payroll and invoices and vendor testimony establishing that the defendants also purchased luxury goods in cash, suggests that the defendants did not deposit the entirety of the cash skim into their personal accounts.

<u>Anticipated Employee Testimony</u>. Multiple employees are expected to testify at trial that John and Helen managed day-to-day operations primarily at the HZ store while Dimitrios was primarily the manager at the RDZ store.  Individual A ostensibly managed the ERD store, though, according to employees, she only sporadically worked in the store.

Multiple employees are expected to testify that they were paid their regular hours with a payroll check but that their overtime wages were paid in cash.  Some employees were told to "clock out" then write down any overtime hours the employee worked on a sticky note so the employee would be paid in cash.  The defendants would then distribute paychecks to employees with the cash folded inside, or in separate envelopes. All three defendants had a role in handing out cash in this fashion.

17

Both John and Helen were voluntarily interviewed as part of this investigation. In her interview, Helen admitted to paying overtime wages in cash, though she insisted that she did it to help the employees "when needed." Multiple employees are expected to testify that John, Helen, and Dimitrios kept track of the stores' sales in the calendar notebooks.

Other Evidence. Evidence also establishes that Dimitrios was responsible for depositing cash not only into the business accounts but also into John and Helen's personal accounts. John and Helen took vacations to their native Greece each summer. A teller at NBT Bank specifically recalled Dimitrios making cash deposits into his parents' accounts while his parents were away on vacation. This is consistent with statements of Dippin Donuts employees that Dimitrios, and Individual A, would assume John and Helen's responsibilities when John and Helen were in Greece.

## VI.   LEGAL AND EVIDENTIARY ISSUES

### a.   Admissibility of Tax Records

Jury trials involving Title 26 tax fraud charges typically begin with the IRS custodial witness to introduce records maintained by the IRS in the normal course, including, but not limited to: (1) tax returns, individual, corporate, and other, of the defendants, filed with the IRS; (2) IRS transcript of accounts (*i.e.*, transcript print outs of tax data maintained by the IRS in its computer system) of the defendant's tax filings; (3) Certificates of a Lack of Record (showing that absence of tax filings for the defendant, related individuals, or entities); and (4) IRS notices sent to the defendants, or correspondence received from the defendants. Most of these documents are accompanied with a cover "blue sheet" certifying the records as authentic and official records.

In this case, the Government intends to call IRS custodian of records, Service Center Court Witness Coordinator Tom Bolus, who will introduce the certified tax records that are relevant in

18

this case, including defendants' personal returns, the corporate returns, and the employment tax returns. Such records will be admitted to show what defendants reported by way of income and tax.

These documents, including IRS computer print-out transcripts of account, are routinely admitted by federal courts as a matter of course not only to show relevant business records and official tax information, but as presumptive proof of taxpayer information. *United States v. Spine*, 945 F.2d 143 (6th Cir. 1991); *United States v. Ryan*, 969 F.2d 238 (7th Cir. 1992) (trial court's decision to admit IRS computer printouts will be reversed only for abuse of discretion); *United States v. Farris*, 517 F.2d 226, 227-29 (7th Cir. 1975) (IRS certified computer records admissible as self-authenticating documents under Fed. R. Evid. 902(4)); *United States v. Neff*, 615 F.2d 1235, 1241-42 (9th Cir. 1980); *United States v. Yakobov*, 712 F.2d 20, 27 (2d Cir. 1983).

### b. Defendants' Statements Offered by the Government Are Admissible

The government will offer as evidence at trial certain oral statements made by defendants to others, including statements made by John and Helen Zourdos during interviews with special agents, as well as statements they made to civilian witnesses. These statements are not hearsay because they constitute admissions by a party-opponent under Federal Rule of Evidence 801(d)(2). *See, e.g.*, *United States v. Meskini*, 319 F.3d 88, 93 (2d Cir. 2003); *United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994).

Admissible statements under this rule include not only direct statements made by the defendants themselves, but also statements made by their agents within the scope of their agent-principal relationship. Such statements in this case include statements made by the defendants' return preparer to an IRS civil auditor, while RDZ Dippin was under civil examination in 2016.

At the time, the return preparer was acting as the defendants' power of attorney before the IRS with respect to the ongoing audit.

Statements of a party's agent or employee are admissible if:  (1) the statements are offered against the party; (2) the statements were made by the party's agent or employee concerning a matter within the scope of the agency or employment; and (3) the statements were made during the existence of the relationship.  *See* Fed. R. Evid. 801(d)(2)(D); *United States v. Villar*, 729 F.3d 62, 86-87 (2d Cir. 2013) (admitting statements of a corporate employee against the corporate officer).

### c.  Defendants' Statements Offered by the Defendant Are Not Admissible

That the government may offer statements of the defendants as party opponents *does not* give the defendants license to introduce self-serving or other hearsay statements made by them. Indeed, while statements of a defendant offered by the government as proponent are admissible against that defendant as statements of a party opponent, *see* Fed. R. Evid. 801(d)(2)(A), statements made by the defendants and offered by the defendants as proponents would constitute inadmissible hearsay.  Fed. R. Evid. 801(d)(2); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *United States v. Ortega*, 203 F.3d 675, 681-82 (9th Cir. 2000) (defendant prohibited from eliciting his own exculpatory statements during cross-examination of government agent); *United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999) ("[A] defendant cannot attempt to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination."); *see also United States v. Neil West, Sr.*, 877 F.3d 434, 439-40 (1st Cir. 2017) (recognizing that the defendant's statements to the police that they should review video that would prove he was not at the crime scene and that witnesses

20

would not be able to identify him as the perpetrator were inadmissible hearsay); *United States v. Cianci*, 378 F.3d 71, 105-06 (1st Cir. 2004) (refusing to allow defendant to admit his own statements made to an undercover FBI agent); *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005) (refusing to allow defendant to admit through cross-examination of the agent statements made by defendant); *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993) (rejecting a defendant's attempt to admit a co-defendant's statement as an admission by a party-opponent and recognizing "[t]he Government is the party opponent of both defendants").

### d. <u>Stipulations</u>

The parties have reach stipulations concerning the authenticity of certain evidence, including business records and public records produced by financial institutions, public entities, and other third parties.  These stipulations obviate the need to call custodial witnesses, although the government intends to call one or more custodians nevertheless to give brief explanation and lend weight to the evidence.  *Accord* Fed. R. Evid. 104(e) (admission does not preclude additional evidence as to weight).  The government has marked these stipulations as exhibits, and will offer the exhibits at the appropriate time.

### e. <u>Admissibility of Business Records</u>

The government will introduce records from third parties, including the defendants' bookkeeper, his accountant, and others – and call the third parties to authenticate and testify to such records to the extent such records are not covered by the aforementioned stipulations. Such records constitute business records pursuant to Fed. R. Evid. 803(6) or admissions of the defendants.

**f.   Summary Charts and Testimony from Agents**

The bank records in this case are voluminous.  A core part of the Zourdos' tax fraud scheme occurred within those bank accounts.

As well, the calendar sales notebooks seized during the execution of search warrants at the Dippin Donut stores are voluminous and contain voluminous numerical entries that cannot be easily and efficiently examined in court.

Accordingly, the government will offer several summary exhibits prepared by agents, including but not limited to summaries of the personal bank account records of the defendants, and summaries of the calendar notebooks.  The government will offer these summaries in addition to offering the underlying records themselves.

IRS Revenue Agent Michael Petrick has meticulously examined and summarized the bank account records, and will offer summary exhibits.  Special Agent Keith Schwarz has thoroughly examined the calendar sales books and has prepared summaries of the voluminous entries contained therein.  Both sets of summaries satisfy Federal R. Evid. 1006 which permits the admission as substantive evidence of such charts that summarize voluminous evidence.  *See United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020).  The agents will also testify regarding the same, highlighting for the jury specific financial transactions in the bank records and notebook entries.  *See United States v. Yang Chia Tien*, 638 F.App'x 19, 21-22 (2d Cir. 2015) (upholding summary testimony by case agents) (summary order).

Rule 1006 allows a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Fed. R. Evid. 1006.  Summary charts must "fairly represent competent evidence already before the jury."  *United States v. Blackwood*, 366 F.App'x 207, 212 (2d Cir. 2010) (summary order) (citing

22

*United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977)).  As long as these requirements of Rule 1006 are satisfied, a summary chart may be offered into evidence and made available to the jury. *See United States v. Rom*, 528 F.App'x 24, 29 (2d Cir. 2013) ("[A] district court may, in its discretion . . . allow properly admitted summary charts into the jury room during deliberations" (citing *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988))).

In this case, the government has already provided the defendants with access to the underlying source material as well as draft versions of the summary charts.  The underlying records themselves are voluminous, as they involve many years of information and many numerical entries.  In short, the summary charts meet the requirement of Fed. R. Evid. 1006.

The Government also notes that it may introduce through Revenue Agent Petrick and Special Agent Schwarz, and other witnesses, visual aids and demonstratives, in addition to Rule 1006 summaries.  Federal Rule of Evidence 611(a), which gives the trial court control over the mode of presenting evidence, also pertains to visual aids and "pedagogical device" summaries. *See United States v. Rom*, 528 F.App'x 24, 29 (2d Cir. 2013) (summary order); *United States v. Scali*, No. 16-CR-466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018).  Rule 611(a) visual aids are typically used as pedagogical devices either to simplify complex evidence or to assist counsel in the presentation of argument to the jury. *See Rom*, 528 F.App'x at 29.  At trial, the government intends to introduce various demonstratives and visual aids in summation, and with witnesses, to assist the jury in understanding the evidence.

Rule 611(a) and Rule 1006 are not mutually exclusive.  For instance, a chart originally offered as a pedagogical device under Rule 611(a) could alternatively be admitted into evidence if it accurately summarizes the underlying documents and the court concludes that the underlying documents are too voluminous to be examined conveniently in court. *See United States v.*

23

*Milkiewicz*, 470 F.3d 390, 397 (1st Cir. 2006). Despite the potential for overlap between the two types of visual aids, the differences are important. A Rule 611(a) visual aid must be based on admitted evidence but is generally not admitted into evidence itself. *But see Rom*, 528 F.App'x at 398 (noting that district courts may permit juries to consider pedagogical device summaries not admitted as evidence with a limiting instruction to "not consider the charts as evidence.") (citing *United States v. Casamento*, 887 F.2d 1141, 1151 (2d Cir. 1989)). Conversely, a Rule 1006 summary chart may be admitted into evidence while its underlying documents can, but do not need to, be in evidence. *See Milkiewicz*, 470 F.3d at 396. Furthermore, a Rule 1006 summary chart must "fairly represent the underlying documents and be accurate and non-prejudicial" while a Rule 611(a) pedagogical device may be less neutral and may reflect the inferences and conclusions of the party offering the summary. *See id.* at 398 (internal quotation marks omitted).

### g.  Admissibility of Other Act Evidence Under Rule 404(b)

Contemporaneously with this memorandum, the government is filing a motion *in limine* to admit evidence of other acts of the defendants pursuant to Federal Rule of Evidence 404(b). As explained further in that motion, the government seeks to introduce evidence that the defendants committed their tax fraud scheme both before and after the years charged in the indictment;[5] that they modified their conduct after becoming aware of the IRS investigation; that they may have structured cash transactions to avoid reporting requirements; and (if necessary to rebut an expected defense focused on the defendants' accountant) that John Zourdos operated a Dunkin Donuts

---

[5] As briefed in more detail in the motion *in limine*, the government's position is that this evidence of the defendants' tax fraud in the years immediately preceding and following the years charged in the indictment is intrinsic to the indictment such that it is admissible independent of Rule 404(b).

franchise in the 1990s and engaged in a similar fraud scheme in that he underreported the true sales of the business, which cost him his franchise agreement.

The Second Circuit favors an "inclusionary approach" under Rule 404(b), admitting evidence of prior crimes, wrongs or acts "unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under Fed. R. Evid. 403, or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (internal citation omitted). This is particularly appropriate in tax cases, where the government has to prove that the defendants willfully violated the law. *See United States v. Bok*, 156 F.3d 157, 165 (2d Cir. 1998) ("[A] defendant's past taxpaying record is admissible to prove willfulness circumstantially."); *United States v. Klausner*, 80 F.3d 55, 63 (2d Cir. 1996) (holding evidence of defendant's pattern of understating his income and repeated failure to file tax returns in prior years "entitled jury to infer willfulness").

The law is decidedly in favor of the Government's approach in this case for good reason; tax evasion is a specific intent crime, and courts recognize that such intent almost always must be proven through circumstantial evidence. *Bok*, 156 F.3d at 165. All of the evidence the government seeks to introduce through Rule 404(b) is admissible for a narrow and acceptable purpose, namely to show the defendants' intent, knowledge, and absence of mistake or accident. An appropriate accompanying jury instruction would prevent the jury from using the other act evidence for any other purpose.

The Rule 404(b) issue is briefed further in the accompanying *in limine* motion.

### h.  <u>Admissibility of Lifestyle Spending to Prove Income and Willfulness</u>

The government will offer evidence of defendants' lavish lifestyle and spending on luxury items such as cars and other vehicles, real estate, vacations, jewelry, clothes, investments, retail,

and other items – expenditures that are substantially inconsistent with their reported wages and income.

Evidence of a defendant's expenditures is admissible to prove unreported income. *United States v. DeMuro*, 677 F.3d 550, 559 (3d Cir. 2012) (evidence of defendants' "lavish personal spending" proved that defendants intended to evade their tax obligations); *United States v. Olbres*, 61 F.3d 967, 971 (1st Cir. 1995) (same); *United States v. Kim*, 884 F.2d 189, 192-93 (5th Cir. 1989); *United States v. Back*, 740 F. App'x 525, 527 (9th Cir. 2018) (lifestyle spending relevant to prove unreported income and willfulness); *see also United States v. Black*, 843 F.2d 1456, 1460-61 (D.C. Cir. 1988) (personal expenditures made with corporate funds included luxury apartment, jewelry, and restaurants); *United States v. Simonelli*, 237 F.3d 19, 30 (1st Cir. 2001) ("considerable sums" spent on "homes, country clubs, cars and other accoutrements of wealth"); *United States v. Mendoza*, 382 Fed. App'x 507, 510-11 (7th Cir. 2010) (corporate funds "lavishly spent" on personal items); *United States v. Chesson*, 933 F.2d 298, 304-06 (5th Cir. 1991) (defendants' use of corporate funds on personal expenditures relevant to willfulness);

Such evidence is highly probative in two ways. First, the impressive spending during the prosecution years is probative of whether the defendants had more taxable income than they reported to the IRS during those years—a necessary element to prove the tax evasion counts pursuant to 26 U.S.C. § 7201. Second, such evidence is highly probative of the willfulness element for the charged counts. Defendants' spending made it more likely that they knew of their legal duty to report all their income but made a "voluntary, intentional" choice to ignore that duty. *Cheek v. United States*, 498 U.S. 192 (1991) (holding "willfulness" is the "voluntary, intentional violation of a [known legal] duty"). Furthermore, defendants' active spending of these sums is marginally more probative of their knowledge of their income than their passive receipt of it. *See*

26

*United States v. Marabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984) ("Although direct proof of a taxpayer's intent to evade taxes is rarely available, willfulness may be inferred by the trier of fact from all the facts and circumstances.").  Any purported danger of prejudice may be minimized by limiting instructions.

> **i.   Admissibility of Testimony by IRS Revenue Agent Performing Tax Computations as a Summary Witness – Not Expert Witness**

In virtually every tax evasion trial pursuant to 26 U.S.C. § 7201, the last witness will be an IRS Revenue Agent who will appear as a summary witness, not an expert, to compute taxes due and owing by a defendant.  This is so, and required, because a core element the government must prove beyond a reasonable doubt, in order to prove tax evasion, is that the defendant, in fact, had an additional tax due and owing that he did not pay.  *E.g., Boulware v. United States*, 552 U.S. 421, 424 (2008).

In this case, the government intends to call Revenue Agent Michael Petrick as its last witness to do basic tax calculations based on the financial evidence admitted at trial.  He will offer summary charts and show how he arrived at his computation of taxes due and owing. The government intends these summaries to be admissible—and admitted—in evidence.

For guidance on the appropriateness of such testimony and summary exhibits, the Court need look no further than *United States v. Stierhoff*, 549 F.3d 19, 27-28 (1st Cir. 2008).  At trial, consistent with long-standing precedent, the court admitted a revenue agent's summary testimony, and his accompanying charts and summaries, who computed the taxes due and owing of the defendant. The defendant in *Stierhoff* appealed the admission of that evidence claiming that such testimony was expert in nature (for which there allegedly was no expert disclosure) and that certain aspects of his testimony drew legal conclusions and usurped the role of the court and the jury.

The First Circuit rejected those arguments, finding that IRS agents doing basic tax computations based on the admitted evidence at trial were merely summary witnesses, not expert witnesses. *See Stierhoff*, 549 F.3d at 27-28 (discussing and affirming testimony by revenue agent as summary testimony); *see also United States v. McElroy*, 587 F.3d 73, 82 (1st Cir. 2009). The IRS agent need not be qualified as an expert witness to testify as a summary witness, particularly when the tax calculations are straightforward and transparent. *See Stierfhoff*, 549 F.3d at 28. The *Stierhoff* court further reasoned:

> Pleshaw's testimony fits comfortably within the mine-run of permissible summary witness testimony in tax cases. We have recognized as a general proposition that testimony by an IRS agent that allows the witness to apply the basic assumptions and principles of tax accounting to particular facts is appropriate in a tax evasion case. *See, e.g., United States v. Hatch*, 514 F.3d 145, 165 (1st Cir.2008); see also *United States v. Mikutowicz*, 365 F.3d 65, 72 (1st Cir.2004) (collecting cases). The key to admissibility is that the summary witness's testimony does no more than analyze facts already introduced into evidence and spell out the tax consequences that necessarily flow from those facts. *See United States v. Pree*, 408 F.3d 855, 869 (7th Cir.2005). We hold, therefore, that in a tax evasion case, a summary witness may be permitted to summarize and analyze the facts of record as long as the witness does not directly address the ultimate question of whether the accused did in fact intend to evade federal income taxes. *See Mikutowicz*, 365 F.3d at 72; *United States v. Sabino*, 274 F.3d 1053, 1067 (6th Cir.2001).

> . . . . [Defendant] points out that a summary witness may not give legal opinions that purport to determine a defendant's guilt, nor may such a witness instruct the jury on controlling legal principles. *See Mikutowicz*, 365 F.3d at 72. Those generalizations are true as far as they go, but neither generalization was offended here. A careful review of the record shows that Pleshaw's testimony did not trespass into this forbidden terrain. He summarized the evidence and stated his conclusions regarding what that evidence showed as to the defendant's tax liability for the years in question. The characterizations that he made en route to those conclusions (classifying various entries as, say, "income" or "expenses") did not represent impermissible legal opinions but, rather, under the methodology that Pleshaw used, were part of a mechanical sorting

> of entries (e.g., classifying all receipts as "income" and all withdrawals as "expenses").

*Id.* at 27-28. In this case, Agent Petrick will testify regarding his calculation of receipts, income, expenses, and tax which necessarily stems from the testimony of other witnesses and admitted documentary evidence. He will not offer an opinion on the state of mind of any of the defendants. Agent Petrick will be doing nothing more than basic arithmetic and tax calculations similar to the agent's testimony in *Stierhoff.*

In addition, although Agent Petrick's testimony is summary in nature, and not expert, the Government disclosed to defendants drafts of his summary charts and a description of his methodology for computing taxes due and owing.

### j. Defendants May Not Confuse the Jury With Improper References To Civil and Administrative Civil Remedies

Evidence and argument regarding the availability of IRS civil audits, collection remedies, and civil penalties is irrelevant in a criminal tax case, and argument that the case should have been further pursued as a civil collection matter rather than a criminal prosecution creates a substantial risk of misleading the jury, prejudicing the government, and inviting jury nullification. *See United States v. DeMuro*, 677 F.3d 550, 565 (3d Cir. 2012) (district court properly excluded evidence of civil tax remedy because "it opened the door to jury nullification, by inviting the jury to reason that the IRS should have continued to pursue the matter civilly rather than criminally"); *United States v. Buras*, 633 F.2d 1356, 1360 (9th Cir. 1980) (explaining that the availability of civil remedies in a tax case "is irrelevant to the issue of criminal liability" and finding that a jury instruction regarding civil remedies "would serve only to confuse the jury"); *United States v. Burkhart*, 501 F.2d 993, 996 (6th Cir. 1974) ("The matter of civil liability is not an issue when a jury is determining a defendant's criminal liability for tax evasion."); *United States v. Merrick*,

464 F.2d 1087, 1093 (10th Cir. 1972) (finding "no relevance" in a jury instruction that a civil case might be brought against a defendant who was convicted of evasion under 26 U.S.C. § 7201); *United States v. Bourque*, 541 F.2d 290, 296 (1st Cir. 1976).

Put simply, the availability of civil remedies is not relevant to the jury's consideration of whether the evidence satisfies the elements of tax evasion, conspiracy, and filing false tax returns. Accordingly, even though there will be some underlying proof concerning civil audit activity, defendants should not be permitted to argue, for instance, that the tax debt stemming from that litigation should have been pursued further through civil collection efforts, or that the defendants should have simply been assessed fines and penalties with respect to their tax returns for the 2013-2016 tax years.

The risk of such jury confusion is real in this case because one of the defendants' stores – RDZ Dippin – was audited during the prosecution years.   The result of the audit was "no change," meaning the IRS auditor did not make additional assessments for the additional sales and receipts that the defendants in fact had and the jury will be shown.   Although she was apparently given calendar sales notebooks disclosing the sales, the evidence will show that she was led to believe the lower cash deposit number appearing within the books were the true sales (which reconciled to the bank accounts), and not the higher numbers on the left.

While the parties will have different interpretations of this audit as it pertains to the most relevant issue in this case (defendants' intent), evidence concerning this audit does not give the defendants license to argue that this matter should have been pursued further civilly, or that the civil IRS auditors did not see the additional sales such that it is the IRS's fault that any subsequent returns filed by the donut stores were inaccurate (or any other iteration of an argument that seeks nullification of the separate criminal prosecution).   Again, the jury should be instructed that even

if civil audits have taken place, that does not preclude a separate criminal prosecution for the same conduct.

### k. **Defendants May Not Invite Jury Nullification through References to Punishment or Other Improper References**

Absent extraordinary statutes requiring the jury to participate in sentencing determinations, the *sole* function of the jury is to determine guilt or innocence. Punishment is within the exclusive province of the Court. *United States v. Del Toro*, 426 F.2d 181, 184 (5th Cir. 1970); *Chapman v. United States*, 443 F.2d 917, 920 (10th Cir. 1971).

As such, it is improper for a party to elicit evidence (or to introduce argument) that would allow the jury to speculate as to the punishment a defendant faces if convicted. *See United States v. Feuer*, 403 F. App'x 538, 540 (2d Cir. 2010) (summary order) (absent exceptional circumstances, a defendant has no legal right to introduce evidence or argument regarding sentencing consequences"); *United States v. Cook*, 776 F. Supp. 755, 756-57 (S.D.N.Y. 1991) ("The function of the jury in a criminal trial is to determine guilt or innocence based upon an impartial consideration of the evidence, unswayed by emotion, fear or prejudice. Where the jury is permitted to speculate concerning a defendant's possible punishment, a jury cannot properly perform that function." (citations omitted)). *See also United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004).

It is proper for the court to interrupt any arguments relating to punishment or appeals for mercy, *see United States v. Wilson*, 439 F.2d 1081, 1082 (5th Cir. 1971), *Gretter v. United States*, 422 F.2d 315, 319 (10th Cir. 1970), and some cases have held that the Court is required to do so. *See United States v. Ramantanin*, 452 F.2d 670, 672 (4th Cir. 1971); *May v. United States*, 175 F.2d 994, 1010 (D.C. Cir. 1949); *see also United States v. Young*, 470 U.S. 1, 13 (1985) (stating

that the "better remedy" would have been for the trial judge to interrupt defense counsel's improper argument rather than leaving it for the prosecutor to address on rebuttal).

To allow the jury to be swayed by evidence or arguments regarding possible punishment would be to permit them to violate their oath not to allow their verdict to be affected by sympathy. *See Del Toro*, 426 F.2d at 184 ("'To inform the jury (concerning) matters relating to disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.'" (quoting *Pope v. United States*, 298 F.2d 507 (5th Cir. 1962))).

In short, the law prohibits counsel from seeking to inflame the prejudices of the jury or conjure up sympathy for a defendant by referring to the potential sentences and collateral consequences the defendant would or might face upon conviction.  Accordingly, any evidence or argument related to the potential penalties faced by the defendants if convicted — whether they involve specific references to years in jail, or general arguments that "the defendants are on trial for their life;" "defendants are facing separation from their family;" or "the defendants' freedom or potential liberty hangs on the outcome of the jury's decision" — should be excluded.

The law is also well-settled that a defendant may not ask the jury to refuse to apply the law as instructed by this Court. *See United States v. Thomas*, 116 F.3d 606, 615-17 (2d Cir. 1997); *United States v. Bowen*, 511 F.Supp.3d 441, 447 (S.D.N.Y. 2021) (prohibiting defendant from advancing arguments aimed at jury nullification). "'[Jury nullification] verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.'" *Thomas*, 116 F.3d at 615-16 (quoting *United States v. Washington*, 705 F.2d 489, 494, (D.C. Cir. 1983)).  Jury nullification is so disfavored in this Circuit that this Court can preemptively constrain defendants' counsel from making any argument that would encourage nullification, and indeed has a "duty to

32

forestall or prevent such conduct." *Thomas*, 116 F.3d at 616; *see also In re United States*, 945 F.3d 616, 625-28 (2d Cir. 2019) (granting petition for writ of mandamus where district court erroneously granted defense counsel permission to argue for jury nullification).

### l.  <u>Leading Questions Are Allowed for Hostile Witnesses</u>

Federal Rule of Evidence 607 instructs that "any party, including the party that called the witness, may attack the witness's credibility." A party may ask a witness leading questions even on direct examination if "necessary to develop the witness's testimony." Fed. R. Evid. 611(c). The government reserves permission to treat its own witnesses as hostile in accordance with these rules when the witness is uncooperative, reluctant to testify candidly, or otherwise evasive or unclear. *See Bingham v. Zolt*. 66 F.3d 553, 566 (2d Cir. 1995) (leading questions "entirely proper" where clear that witness has become hostile); *United States v. Mora-Higuera,* 269 F.3d 905, 912 (8th Cir. 2001) (declining to overturn district court decision that a witness who became "evasive and unclear" was hostile); *United States v. Brown*, 603 F.2d 1022, 1025-26 (1st Cir. 1979) (unnecessary to show that the witness is "contemptuous or surly"); *see also United States v. Ienco*, 92 F.3d 564, 568 (7th Cir. 1996) ("the asking of leading questions is a standard technique of impeachment. It is a technique more commonly employed in cross-examination than in direct examination, for the obvious reason that the other side's witnesses are more likely to be adverse than one's own. But if you call an adverse witness you can, in effect, cross-examine him.").

The government may impeach its own witnesses for the purpose of aiding its case-in-chief under the modern application of Federal Rule 607.  *United States v. Eisen*, 974 F.2d 246, 262 (2d Cir. 1992) (holding that the government's calling of several hostile witnesses for the purpose of eliciting testimony it knew would be perjurious and would aid its case-in-chief was permissible); *see United States v. DeLillo*, 620 F.2d 939, 946-47 (2d Cir. 1980) (explaining that Federal Rule of

Evidence 607, without further restriction, abrogates the notion that the government may not call a hostile witness solely for the purpose of impeaching him). Outside of treating a witness as hostile, the government on direct examination may also ask leading questions to witnesses who are nervous, confused, disoriented, incapable of concentration, or experience temporary lapses of memory. *See United States v. Salameh*, 152 F.3d 88, 128 (2d Cir. 1998) (holding that while leading questions are generally not permitted during direct examination, leading questions may be necessary to elicit testimony from a "nervous" witness); *see also United States v. McGovern*, 499 F.2d 1140, 1142 (1st Cir. 1974).

### m.  Case Agent and Revenue Agent as Exceptions To Sequestration Rule

Either party or the Court may request that the witnesses be excluded from the courtroom during trial pursuant to Federal Rule of Evidence 615.  Should the sequestration rule be invoked, it is well settled that a case agent may sit at counsel table with the government in a criminal trial regardless of any sequestration order affecting other trial witnesses. *Cf. United States v. Jackson*, 60 F.3d 128, 133-34 (2d Cir. 1995) (citing cases). In this matter, the government intends to designate as its case agent Special Agent Keith Schwarz with IRS Criminal Investigation.  Because Special Agent Schwarz was significantly involved in investigating the case, the government requests that he be permitted to sit at counsel table with the government throughout the trial, both before and after any testimony he may offer, pursuant to Federal Rule of Evidence 615(b).

Special Agent Schwarz will also testify as a summary witness on certain limited matters. Special Agent Schwarz's testimony will be purely summary in nature.  He was not a percipient witness either to witness interviews or conduct by the defendants.  Instead, he may offer purely summary testimony based on summary charts he will prepare concerning underlying voluminous records which will be offered into evidence, namely, calendar notebooks maintained by the

defendants to record true sales.  Therefore, the risk that his testimony could be impacted or skewed by his presence in the courtroom while fact witnesses testify is non-existent.

In addition, the government will request that, in addition to the case agent, Revenue Agent Petrick be permitted to remain in the gallery during the presentation of the evidence – not at counsel's table.  *See United States v. Lussier*, 929 F.2d 25, 30 (1st Cir. 1991) (allowing an IRS agent who was a summary witness to remain in the courtroom in addition to the case agent); *United States v. Ratfield*, 342 Fed. App'x. 510, 512-13 (11th Cir. 2009) (unpublished) (permitting two IRS agents to remain in courtroom during the trial given the nature of their respective testimony).

The Government contends that Agent Petrick is a person whose presence is essential to the presentation of the Government's case under Rule 615(c).  Indeed, his role as a summary witness is to know and summarize the tax related evidence admitted at trial as it pertains to defendant's taxes due and owing. The purpose for sequestering a witness is "to prevent the shaping of testimony by witnesses to match that given by other witnesses." *United States v. Strauss*, 473 F.2d 1262, 1263 (3d Cir. 1973); *United States v. Cozzetti*, 441 F.2d 344, 350 (9th Cir. 1971).  When the witness's testimony relates only to a summary of records and testimony and does not depend on any prior testimony, even the rationale for the sequestration of the witness is absent.  *Id.*

In fact, the agent's presence may imbue to the defendants' benefit.  *See United States v. Barnwell*, No. 15-cr-620-NSR, 2017 WL 1063457, at *3 (S.D.N.Y. Mar. 20, 2017) (unpublished) (allowing a summary witness to attend trial in addition to case agent and agreeing that "it will be more efficient to allow [the summary witness agent] to follow the evidence as it is presented to ensure she only comments on evidence properly admitted at trial, and to ensure the accuracy of her testimony should cross-examination 'bring out any facts not considered' by the Government's

other witnesses").  Accordingly, Agent Petrick, as a summary witness, should be excluded from a sequestration order and be permitted to be present in the courtroom throughout the trial.

### n.  Sequestration of Individual A

The government anticipates that Individual A may testify on behalf of the defendants at trial. Unless the defendants agree and represent to this Court in advance that they will definitely not call Individual A as a witness at trial, the government asks this Court under Fed. R. Evid. 615 to exclude Individual A from the courtroom prior to her testimony and to order that the defendants and counsel are prohibited from informing Individual A what has occurred or is occurring in the courtroom before she testifies.

### o.  Defendant's Expert Disclosures

Contemporaneously with this memorandum, the government is filing a motion *in limine* opposing the defendants' attempt to introduce expert testimony, which appears to be an effort to shift the jury focus away from the ultimate issue in the case – defendants' intent and willfulness – by attempting to place defendants' tax preparer on trial.  The proposed testimony is unnecessary, usurps the role of the Court on questions of law, and would be confusing to the jury in the context of a case that will and should be focused the willfulness and intent of the defendants, which are jury questions that, in this case, largely turn on fact questions about whether—and to what extent— the defendants gave their accountants the necessary information to prepare accurate returns, and whether they acted willfully in diverting approximately $2 million in cash from Dippin Donuts; filing and causing to be filed false tax returns that did not report this income; and paying employees in cash under the table without reporting these payments to the IRS.

These recent expert disclosures, which do not even provide the "opinions" of the proposed experts as required by Rule 16, suggest the experts intend to focus primarily on two issues: (1)

36

opining on the competence and professionalism of the defendants' tax preparers; and (2) explaining tax law to the jury. As argued at greater length in the government's motion, neither of these purposes is a permissible basis for expert testimony. Any testimony that the tax preparers made miscalculations on other areas of the tax returns or "should have" discovered the tax fraud at issue is irrelevant to the defendants' intent with respect to their reported and unreported income, so expert testimony on such issues would confuse the jury and divert attention away from the elements of the crimes charged and the key issues in the case.

Finally, experts (including the lawyer and accountant noticed as an expert by John and Helen Zourdos) should not be used to explain tax law to the jury, which is the province of this Court and can be dealt with through standard jury instructions, as is the norm in tax cases. Indeed, the government has included in its jury instructions standard instructions relevant to tax cases, such as the definition of income. With such legal guidance from the Court (including any additional instructions needed to explain relevant tax law provisions), the jury will be well equipped to decide the fact issues in the case, including the income made and disclosed (or not disclosed) by the defendants, along with the defendants' intent, as in a typical tax fraud case. No experts are needed to explain these legal or factual issues to the jury.

## VII.   <u>CONCLUSION</u>

The government respectfully submits this trial memorandum, reserving its right to submit further briefing and argument as may become necessary, both before and during the trial.