IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.     5:20-cr-00298-DNH |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN ZOURDOS,** | ) | |
| **HELEN ZOURDOS, and** | ) | |
| **DIMITRIOS ZOURDOS,** | ) | |
| | ) | |
| **Defendants.** | ) | |


**GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION
TO THE DEFENDANTS' POST-TRIAL MOTIONS FOR JUDGMENT OF ACQUITTAL
AND FOR A NEW TRIAL**

Undersigned counsel for the United States hereby submits the government's consolidated response to the post-trial motions filed by defendants John and Helen Zourdos, Dkt. No. 106, and defendant Dimitrios Zourdos, Dkt. No. 107.

Dated:  February 7, 2022

Respectfully submitted,

DAVID A HUBBERT
Acting Assistant Attorney General

*/s/ John N. Kane, Jr.*

By:   JOHN N. KANE, JR.
Assistant Chief
U.S. Department of Justice, Tax Division
Northern Criminal Enforcement Section
Bar Roll No. 515130

CARLA B. FREEDMAN
United States Attorney

*/s/ Michael F. Perry*

By:   MICHAEL F. PERRY
Assistant United States Attorney
Bar Roll No. 518952

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................. 3

   I.   LEGAL STANDARD ...................................................................................... 3

      a.   Motion for Judgment of Acquittal Pursuant to Rule 29 .......................... 3

      b.   Motion for New Trial Pursuant to Rule 33 ............................................. 4

   II.  RULE 29:  THE TRIAL EVIDENCE SUPPORTED THE JURY'S RATIONAL
      FINDINGS OF GUILTY ON ALL COUNTS OF THE INDICTMENT ........................... 5

      a.   Count 1:  Conspiracy To Defraud the United States (18 U.S.C. § 371) ................. 5

         i.   John and Helen's Motion for Acquittal on Count 1 is Without Merit ............... 11

         ii.   Dimitrios's Motion for Acquittal on Count Also Lacks Merit ........................ 14

      b.   Counts 2-8:  Tax Evasion (26 U.S.C. § 7201) ................................................. 16

         i.   Counts 2-5:  Tax Evasion Concerning John/Helen's Taxes ............................ 18

            1.   John and Helen's Motion for Acquittal Should be Denied .......................... 18

            2.   Dimitrios's Motion for Acquittal Should be Denied .................................... 20

         ii.   Counts 6-8:  Tax Evasion Concerning Dimitrios Zourdos' Taxes ..................... 25

            1.   Dimitrios's Motion is Without Merit ..................................................... 25

            2.   John and Helen's Motion is Without Merit ............................................. 28

      c.   Counts 9 through 15: Aiding/Assisting in the Filing of False Returns (26 U.S.C.
      § 7206(2)) ................................................................................................. 32

         i.   John and Helen's Motion Is Without Merit ............................................. 33

         ii.   Dimitrios's Motion Should be Denied ................................................... 41

**III. RULE 33: A NEW TRIAL UNDER RULE 33 IS UNNECESSARY** .......................... 43

**CONCLUSION** ................................................................................................... 44

## PRELIMINARY STATEMENT

Undersigned counsel for the United States hereby responds to the defendants' post-trial motions for judgement of acquittal pursuant to Fed. R. Crim. Proc. 29(c), and for a new trial pursuant to Fed. R. Crim. P. 33. *See* Dkt. Nos. 106-08.

As charged in the Indictment, and as proven at the seven-day jury trial in November 2021, defendants John Zourdos, Helen Zourdos, and Dimitrios Zourdos conducted a years-long conspiracy to defraud the United States by skimming cash from their Dippin Donuts stores and then using that skimmed cash to pay themselves and their employees under the table. The evidence supporting the defendants' convictions was substantial, multi-pronged, and corroborative. Voluminous bank records showed that the defendants withheld cash sales from designated donut store business accounts and diverted said cash into multiple personal accounts to disperse and conceal it from the IRS. Calendar sales notebooks maintained by the defendants, which were located during a search warrant, coupled with witness testimony, proved that each defendant carried out and recorded the fraudulent diversion of cash sales year after year in a "double set of books," which they withheld from their accountants. Testimony and documentary evidence proved that each defendant managed the stores, handled the counting of cash drawers, and made cash deposits to the banks. Witnesses testified that each defendant paid employees partially in cash "under the table" without reporting such wages to the IRS. Special agents and third-party witnesses testified that John and Helen Zourdos hoarded approximately $300,000 in undeposited cash at their home and that the defendants spent thousands of dollars in undeposited cash on lavish purchases. IRS and search warrant records, in conjunction with witness testimony, proved that

each defendant authorized the filing of false personal tax returns reporting very low income that, as a reasonable jury could (and did) conclude, the defendants knew were materially false.

For years, the only sales records the defendants turned over to their accountants were the business bank account statements, thereby concealing from the accountants the $2.8 million in skimmed cash, much of which the defendants deposited into personal bank accounts. John Zourdos himself even admitted to federal agents that he only provided to his accountants the business bank account statements and not the calendar sales books reflecting all sales.

Defendants' pending post-trial motions are contrary to law and fact.  A primary contention running through the motions is that the defendants cannot be guilty because they were not each directly involved in every element of the conspiracy (including interfacing with the accountants and handling tax return preparation).  However, the law does not require direct involvement in every aspect of the conspiracy. In any event, each defendant *did* have a central role in the conspiracy year after year, whether by diverting undeposited cash sales; paying employees under the table; signing false individual tax returns; and/or doctoring sales books to conceal true sales. As set forth below, a defendant need not personally be involved in every act furthering an unlawful objective to be guilty of the charged offenses, and the jury here properly analyzed and weighed the voluminous evidence of the defendants' willful intent, thus fulfilling its role.

For these reasons, and those set forth more fully below, the defendants' motions should be denied in their entirety.

2

# ARGUMENT

## I.   LEGAL STANDARD

### a.   Motion for Judgment of Acquittal Pursuant to Rule 29

A defendant challenging the sufficiency of the evidence "bears a very heavy burden." *United States v. Gonzalez*, 110 F.3d 936, 940 (2d Cir. 1997). The ultimate question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

In ruling on a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, the Court must draw all reasonable inferences in favor of the prosecution and must examine all the evidence in the light most favorable to the government. *See United States v. Artuso*, 618 F.2d 192, 195 (2d Cir. 1980). The question is whether a "reasonable mind" could have found the defendant guilty beyond a reasonable doubt. *Id.* (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)). With respect to the trial evidence, "[a]ssessments of witness credibility and choices between competing inferences lie solely within the province of the jury." *United States v. Cacace*, 796 F.3d 176, 192 (2d Cir. 2015) (quoting *United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010)); *see also Espaillet*, 380 F.3d at 718 ("It is settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence

3

and the reasonable inferences to be drawn for that of the jury.'" (quoting *Guadagna*, 183 F.3d at 129)).

### b.  Motion for New Trial Pursuant to Rule 33

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." This rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). "[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir.2009) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *Sanchez*, 969 F.2d at 1414 (citation and internal quotation marks omitted).

Orders for new trials under Rule 33 are "not favored," *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir. 1981), and even where there is newly discovered evidence (which is not alleged here), a new trial should be granted "only with great caution" and only "*in the most extraordinary circumstances*," *United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir. 1987) (citations and quotation marks omitted) (emphasis in original). A new trial will be ordered only where there has been a "manifest injustice," such as "[w]here testimony is patently incredible or defies physical realities." *Sanchez*, 969 F.2d at 1414.

4

## II.   RULE 29:  THE TRIAL EVIDENCE SUPPORTED THE JURY'S RATIONAL FINDINGS OF GUILTY ON ALL COUNTS OF THE INDICTMENT

### a.   Count 1:  Conspiracy To Defraud the United States (18 U.S.C. § 371)

Count 1 of the Indictment charges all three defendants with conspiring with one another, and with others known and unknown to the grand jury, from in or about 2013 through and including in or about 2017, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the functions of the IRS in the ascertainment, computation, assessment, and collection of individual income tax, corporate income tax, and employment taxes, all in violation of Title 18, United States Code, Section 371. Dkt. No. 1 ¶¶ 1-15.

The government was required to prove the following elements beyond a reasonable doubt to establish a violation of 18 U.S.C. § 371 as charged in the Indictment: (1) an agreement among two or more persons, the object of which was to defraud the United States; (2) the defendant's knowing and intentional joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the alleged co-conspirators.  *See United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003).

To establish a conspiracy in violation of 18 U.S.C. § 371, the government need not present evidence of a "formal or express" conspiratorial agreement:

> The government may prove its existence by circumstantial evidence, provided such evidence establishes beyond a reasonable doubt the defendants' knowledge of the essential nature of the plan and their connections with it. The government need not prove that the defendants knew the details of the conspiratorial scheme or the identities of all of the conspirators.

*United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002) (cleaned up).

The trial evidence was more than sufficient for a reasonable jury to conclude beyond a reasonable doubt that all three defendants were guilty of a conspiracy to defraud the United States.

To begin, John and Helen jointly owned, operated, and oversaw Dippin Donuts and its three locations.  Tr. 95:4-17; 244:1-3; 281:1-3; 327:17-328:4; 350:13-18; 420:2-7; 667:11-16; 755:7-8; 843:24-845:15.[1]  As such, they were responsible, among other things, for hiring and firing employees, Tr. 244:14-18; 351:6-7; 395:8-10; scheduling and payroll, Tr. 244:14-25; 350:19-20; 395:22-25; counting and supervising the counting of drawers, Tr. 350:21-24; 395:8-21; 789:25-790:4; and depositing in the bank cash sales from the donut stores, Tr. 151:24-152:5; 327:17-329:9; 350:25-351:5. Dimitrios Zourdos, the adult son of John and Helen, primarily managed the RDZ Dippin Store located on Black River Boulevard in Rome, New York, Tr. 97:7-21; 150:8-151:5; 856:7-8, but when his parents went to Greece on a nearly annual basis Dimitrios would stay behind to run the stores until one of them came back, including by handling payroll and making bank deposits, Tr. 97:25-99:8; 125:11-126:1; 151:6-23; 245:16-246:8; 351:14-352:1; 357:8-13; 395:22-396:22; 420:8-421:2; 790:22-791:6.

The defendants hired Vincent Gilroy, CPA, and an accountant on his staff, Heather O'Rourke, to prepare and file their personal tax returns and corporate tax returns for the three donut stores. Tr. 482:16-483:17. Gilroy testified that he and John had a conversation about how "all sales should be deposited in the corporate bank account," and that John indicated he understood this. Tr. 587:2-16. O'Rourke testified that John and Helen told her that "[t]he deposits for the business were going into the corporate bank account." Tr. 491:3-6. In response to cross-examination questions suggesting that she had merely *assumed* the sales proceeds from the donut stores were going into the business bank accounts, O'Rourke clarified, "No. They told us that."

---

[1] Unless otherwise specified, references in this brief to the trial transcript in this case, *see* Dkt. Nos. 98-104, are preceded by "Tr."

Tr. 540:5-12. Gilroy and O'Rourke testified the defendants provided them with corporate bank account statements for each donut store. Tr. 484:1-10; 486:19-487:12; 574:16-22; 580:19-581:6. O'Rourke would then enter the data from the corporate bank statements into QuickBooks, an accounting software program used to generate the corporate financial statements and prepare the corporate tax returns. Tr. 491:11-492:19; 510:6-23; 580:7-581:17; 593:17-594:8. Gilroy and O'Rourke also testified they did not receive personal bank statements from the defendants, Tr. 487:23-24; 586:19-21, and did not otherwise have access to the defendants' personal bank statements, Tr. 483:10-17; 575:4-17. Gilroy and O'Rourke prepared the corporate tax returns for the three donut stores based on information taken from the business bank statements provided by the defendants and from any records of business expenses the defendants provided, such as credit card statements on which one of the defendants would annotate which expenses were business expenses. Tr. 495:6-496:12; 580:7-581:17. Gilroy would provide the corporate returns to John and Helen and give them an opportunity to review them prior to filing. Tr. 585:21-586:18.

Gilroy and O'Rourke also prepared personal tax returns for the defendants. Tr. 483:2-5; 542:14-16. They sent copies of these returns to the defendants, along with IRS Forms 8879, which the defendants signed and returned, usually before the tax returns were filed. Tr. 517:4-19; 521:14-20; 608:25-612:25; 614:7-615:4; 1129:10-18. Each Form 8879 listed the income information on the previously prepared tax return; authorized the tax return preparer to file the return; and affirmed that the information on the return was accurate, subject to the pains and penalties of perjury. *See* Tr. 515:8-16; 610:7-612:25; 1153:16-1154:21.

Christine Zakris-Carpenter testified that she interviewed John Zourdos on August 2, 2017, and that he admitted he gave his tax return preparer only the statements for each donut store's separate corporate bank account and did not provide any sales receipts or calendar notebooks. Tr.

7

850:24-858:11; 1156:18-1158:22.[2] Pavel Prilutsky testified that he interviewed Helen Zourdos on August 29, 2017, and that she claimed all sales from Dippin Donuts were deposited into the business bank accounts and that no cash was withheld from the deposits. Tr. 869:7-875:7.[3]

A true record of the total daily sales from each store, including cash sales, was maintained in a calendar notebook at each store. Tr. 254:22-255:17; 398:17-24; 793:21-794:13. These notebooks contained the handwriting of all three defendants, Tr. 360:7-363:1; 403:12-404:25; 800:16-804:4, and they were not provided to Gilroy and O'Rourke to prepare the income tax returns or QuickBooks entries, Tr. 493:1-14; 602:9-18; 857:12-858:04; 1156:18-1158:22.[4] The defendants did not deposit all cash sales from Dippin Donuts into the business accounts and instead deposited much of the money into personal bank accounts. *See* Tr. 1119:12-1122:12.

The calendar notebooks show that the donut stores made millions more in sales and receipts than the defendants deposited into the stores' business bank accounts. Tr. 929:24-949:2; 1019:3-1020:19; Govt. Exs. 356; 402A-H; 403A-H.[5] Specifically, the HZ Dippin store had $1,122,955 in unreported and undeposited sales receipts between 2013 and 2016, Tr. 1019:3-25; and the RDZ Dippin store had $1,729,478 in unreported and undeposited sales receipts between 2013 and 2016,

---

[2] This Court instructed the jury to consider John's admissions from this interview only against him. Tr. 853:13-21.

[3] This Court instructed the jury to consider Helen's admissions from this interview only against her. Tr. 871:20-872:2.

[4] Gilroy testified that many years prior to the offense conduct charged in the Indictment the defendants would provide a calendar notebook containing sales tax information. Tr. 600:11-23. He identified Govt. Ex. 132, a notebook from 2002, as an example of one such notebook he received for purposes of tabulating the sales tax collected. Tr. 601:4-602:4.

[5] Upon request, the government can provide this Court with copies of any or all of the government exhibits introduced at trial which are cited in this brief.

8

Tr. 1020:4-16; Govt. Ex. 356. Much, but not all, of this cash went into the personal bank accounts of the three defendants and of Rose Zourdos. Tr. 1119:3-1122:12. The defendants stopped virtually all cash deposit activity after John and Helen were separately interviewed by IRS agents in August 2017, and the defendants increased their reported W-2 wages from Dippin Donuts after those interviews as well. Tr. 1020:23-1026:11; Govt. Ex. 365.

The jury also heard evidence that the defendants had access to—and used—significant sums of cash. When the home of John and Helen Zourdos was searched in June 2018, law enforcement agents found $299,143 in U.S. currency. Tr. 192:6-214:17; Govt. Ex. 401-D (Joint Stipulation 4). Multiple examples of cash purchases for personal expenses were introduced at trial. For example, in approximately September 2016, John Zourdos paid more than $18,000 in cash for a Rolex watch for his wife, Helen. Tr. 458:5-467:20; Govt. Ex. 161-A. John Zourdos also paid $21,000 in cash for a Porsche 911 sports car. Tr. 446:2-454:10; Govt. Exs. 160-A; 160-B; 400-D. In 2016 and 2017, Dimitrios Zourdos paid a total of approximately $26,500 in cash to restore a 1963 Ford Galaxie. Tr. 817:14-826:13; Govt. Exs. 162; 400-G.

By concealing the cash they took from Dippin Donuts and by failing to report that cash income to Gilroy and O'Rourke, the defendants caused false personal and corporate income tax returns to be filed, which dramatically underreported the sales of Dippin Donuts and the income of the defendants. Tr. 981:8-1020:19. John Zourdos admitted on cross-examination that he reviewed the financial statements of Dippin Donuts with Gilroy and saw what was being reported to the IRS, though he claimed he "didn't even look at the numbers." Tr. 1146:16-1148:7. John also admitted that he signed the 8879 forms for his personal tax returns and saw on those forms what was reported to the IRS as his income. Tr. 1149:9-14.

The defendants also used cash to pay employees off the books for hours worked at Dippin Donuts. Multiple current and former employees testified that they were paid their overtime hours in cash and that no taxes were taken out of the cash wages. Tr. 99:23-104:3 (Brittany Labuz); Tr. 138:18-139:24 (Whitney Sykes); 348:12-358:5 (Shane McRae); 400:8-402:16 (Catalina Lyness); 422:18-424:15 (Angela Layman); 757:13-758:22 (Tyler Falcone). Josh Gilbert testified that John and Helen Zourdos told him when he was hired to bake donuts that bakers were paid entirely in cash and that he subsequently received all or most of his wages in cash—with no taxes taken out. Tr. 881:22-887:13. Gilbert further testified that the cash payments stopped only after law enforcement agents executed a search warrant at Dippin Donuts. Tr. 886:2-887:7.

Dippin Donuts utilized Payco, a third-party company, to process payroll checks for its employees and to generate and file payroll tax returns. Tr. 892:2-893:11. Payco used timecard data provided by Dippin Donuts to generate the paychecks and calculate the payroll taxes due to the government. Tr. 892:14-20; 902:4-10; 914:6-21. Payco was never informed by the defendants or anyone else at Dippin Donuts that employees were paid in cash, and Thomas Bosman, the vice president and day-to-day head of Payco, testified this information would have been significant because Dippin Donuts' payroll tax obligations would have been greater if the cash payroll had been reported. Tr. 906:18-907:1; 910:4-16. In addition to withholding information from Payco about the cash payroll, the defendants falsified some of the timecard data submitted to Payco to understate the number of hours worked by certain employees. Tr. 918:18-924:14. Gilroy was also unaware of the extensive overtime cash payroll, which would have mattered to him in the preparation of corporate tax returns because "that would mean that the sales had been understated because if you pay them in cash out of the register, you are not reporting all your sales," meaning

that "the financial statements and tax returns prepared were incorrect" in not accounting for the cash payroll. Tr. 659:9-660:7.

In the light most favorable to the government, the trial evidence more than sufficed for a reasonable jury to conclude that all three defendants conspired with each other to defraud the IRS as charged in the Indictment, as the defendants' shared responsibilities to run Dippin Donuts and manage the three stores and each defendant's involvement in the various aspects of the scheme described above demonstrates that each knew the purpose of the conspiracy and joined the conspiracy with the intent to bring about that purpose. The defendants performed overt acts in furtherance of this conspiracy, including by providing incomplete information to the accountants; depositing proceeds from the donut stores' sales into personal accounts; maintaining calendar notebooks that functioned as a second set of books reflecting true sales, which the defendants did not provide (and knew they did not provide) to their accountants for tax preparation purposes; and maintaining a partial cash payroll, thereby avoiding payroll taxes.

On this record, a reasonable jury could reasonably find each defendant guilty of the conspiracy count charged in the Indictment, and the defendants' arguments for judgment notwithstanding the verdict are without merit.

### i.  <u>John and Helen's Motion for Acquittal on Count 1 is Without Merit</u>

John Zourdos argues that the evidence was insufficient to convict him of the conspiracy count despite his involvement in diverting cash sales from the stores into personal bank accounts because "all of the sales for the years charged in the Indictment were accurately recorded in the calendar books," which were provided to O'Rourke and Gilroy and then to Susan Johnson when she audited RDZ Dippin on behalf of the IRS, and because Gilroy purportedly "explained" the calendar books to Johnson, resulting in a no-change audit. Dkt. No. 106-1 at 13-14.

11

Case 5:20-cr-00298-DNH   Document 113   Filed 02/07/22   Page 15 of 47

Count One of the Indictment alleges that the conspiracy began in 2013, Dkt. No. 1, which is consistent with the trial evidence, as the various overt acts at issue—including the defendants' managerial roles at Dippin Donuts; their diversion of cash sales; their failure to inform Gilroy of the true sales; and their illegal cash payroll—were materially unchanged between 2013 and 2016,[6] meaning the defendants had already satisfied the elements of the conspiracy charged in Count One before the audit even began. Gilroy and O'Rourke testified that they were not aware of or provided with the calendar notebooks and therefore did not rely on them to prepare tax returns or QuickBooks entries. Tr. 493:1-14; 602:9-18; 857:12-858:17; 1156:18-1158:22. Gilroy and O'Rourke were also unaware of the diversion of cash into personal bank accounts, Tr. 491:3-10; 540:5-12; 586:2-587:22, as was Susan Johnson, who testified that she would not have issued a no-change audit if she had known about such cash diversions, Tr. 734:3-19. A reasonable jury could credit the testimony of Gilroy, O'Rourke, and Johnson, and conclude that the calendar notebooks incriminate – rather than exonerate – the defendants, who purposely did not provide them to their accountants in the regular course of their dealings. In fact, the trial evidence demonstrated that within days of turning over the calendar books to Susan Johnson during the audit (months after a request for any such records was issued by the IRS), the calendar books at the stores from which the defendants diverted cash sales – HZ Dippin and RDZ Dippin – began showing doctored entries with artificially inserted decimal points, Tr. 940:18-943:25; 964:21-968:4; Govt. Exs. 129-A; 130-

---

[6] The witness testimony did not reveal any significant differences in the operation of Dippin Donuts or the roles of the three defendants between 2013 and 2016, and some of the witnesses were specifically asked to confine their testimony to the period of time before 2017. *See* Tr. 136:2-6; 333:9-12; 753:13-19; 851:14-852:2

A; 402-G, underscoring the defendants' consciousness of guilt and an attempt to hide the true meaning of the calendar book entries in case any outsiders ever looked at them again.

With respect to the cash payroll, John Zourdos argues that he cannot be guilty because he "testified that his motive was simply to [a]void the expense of paying time and a half as a business decision," and because the "government never introduced evidence of the total amount of payroll taxes that it thought were not paid for the years in issue." Dkt. No. 106-1 at 14-15. First, proving and quantifying actual loss is not an element of section 371, *see, e.g.*, *United States v. Rosengarten*, 857 F.2d 76, 79 (2d Cir. 1988); *United States v. Everett*, 692 F.2d 596, 599 (9th Cir. 1982), although there was considerable evidence at trial that defendants paid employees hundreds of dollars a week in untaxed wages.  In addition, the jury was not required to credit John's self-serving testimony, particularly where John admitted on cross examination that he was aware of – and fulfilled – his obligations with respect to payroll taxes for the portion of the payroll that was on the books and paid by check. Tr. 1141:20-1144:19. Also, John Zourdos's testimony that the employees were independent contractors for the hours for which they were paid in cash conflicted with the testimony of multiple employees who denied knowing they were contractors and testified that their job responsibilities did not change when they worked overtime.[7] Tr. 105:14-21; 140:3-9; 359:2-11; 426:12-25; 757:25-759:11; 1144:3-19. John and Helen's own expert, Dana Kaufman, admitted on cross-examination that an employee whose duties do not change is not an independent contractor. *See* Tr. 1200:25-1201:5. Finally, the defendants withheld information about their cash payroll from Gilroy, Tr. 658:17-660:7, and they did not issue 1099 forms to any employees, Tr.

---

[7] At sentencing, the government intends to move for a 2-point sentencing enhancement as to defendant John Zourdos based on his false and fraudulent trial testimony.  U.S.S.G. § 3C1.1.

13

443:7-9; 607:22-608:19; 757:25-758:9; 913:20-914:5, further undercutting John's independent contractor testimony. In short, a reasonable jury could infer, based on all the evidence, that Dippin Donuts employees were never independent contractors and that the defendants maintained a cash payroll to reduce their payroll tax obligations, which would have been higher if they had accurately accounted for all the hours worked by their employees. Tr. 659:17-660:7; 690:8-17; 906:23-907:1; 910:4-16.

Helen Zourdos also challenges the sufficiency of the evidence against her as to Count One, but her brief contains no arguments or facts supporting this position. As described above, Helen was co-owner of Dippin Donuts and was involved in virtually every aspect of the business and the conspiracy. Further, she lied to the agents about two key issues when she was interviewed in August 2017, falsely claiming that all sales from the donut stores were deposited into the business bank accounts, with no cash withheld, and that she had only $3,000 or $4,000 in cash on hand. Tr. 874:22-875:21. She also lied to Gilroy about the extent of the cash payroll, falsely reporting to him under the guise of full disclosure that only one employee was paid in cash and that the reason for these cash payments was to help the employee retain government benefits. Tr. 630:14-631:10. Helen also encouraged Angela Layman to hide her cash wages from the government by instructing Layman to only take her W-2 form to her tax preparer, which Helen would have known did not account for the cash wages. *See* Tr. 424:21-425:12. In short, Helen took steps to further the conspiracy and to lie about it, demonstrating her consciousness of guilt.

### ii.   Dimitrios's Motion for Acquittal on Count Also Lacks Merit

Dimitrios claims that the "evidence related to Count 1 was marginal, at best," Dkt. No. 107 at 2, arguing that the proof shows he only "occasionally—and primarily while his parents were [a]way in Greece during the summer—distributed cash payroll" and that he "acted like any other

14

manager level employee of the Dippin Donuts business," *id.* at 16. On the contrary, the trial
evidence showed that Dimitrios played a significant role in the conspiracy. In addition to managing
the Black River Boulevard store, Tr. 97:7-21; 150:8-151:5, and taking over the operation of all
three stores when his parents were in Greece, Tr. 97:25-99:8; 125:11-126:1; 151:6-152:5; 245:16-
246:8; 351:14-352:1; 357:8-13; 395:22-396:22; 420:8-421:2; 790:22-791:6, Dimitrios's
handwriting was all over the calendar notebooks, which functioned as a second set of books, *E.g.*,
Tr. 360:7-362:21; 364:25-366:36; 801:3-804:10; Govt. Exs. 129-B; 130-A; 130-B. Dimitrios's
handwriting was also identified in the calendar notebooks on dates where the misleading decimal
points were inserted beginning in 2018, *e.g.*, Tr. 366:15-367:5; 804:5-13; Govt. Ex. 130-B at 142,
so the jury could reasonably infer that he was involved in attempting to cover up the true meaning
of those calendar books after the accountants and the IRS became aware of those notebooks in the
audit of RDZ Dippin. Dimitrios also personally participated in diverting cash from the business,
including by filling out deposit slips and making deposits into personal accounts (his own and
those of family members). *See* Tr. 151:24-152:5; 253:4-13; 327:17-342:24; 789:2-15. In fact,
Dimitrios would deposit cash along with his own paycheck, showing that he was receiving his pay
in much the same way the employees did who got overtime pay under the table. *See, e.g.*, Tr.
991:9-994:15; Govt. Ex. 351-B. Dimitrios stopped making cash deposits (with one exception) after
his mother was interviewed by IRS agents in late August 2017, Tr. 1020:23-1022:13; Govt. Ex.
365, and his on-the-books paychecks went up after that interview as well, Tr. 1020:23-1024:10,
from which a reasonable jury could infer that Dimitrios was aware that the cash deposits were
evidence of tax fraud; that he stopped depositing cash after his parents' interviews to avoid
detection; and that he knew the additional money he had been receiving outside of his paycheck
was not freely given as a gift but was part of his total compensation for working at Dippin Donuts.

15

In short, the defendants' challenges to Count One of the Indictment should fail, in light of the strength of the evidence introduced at trial.

### b. Counts 2-8:  Tax Evasion (26 U.S.C. § 7201)

To convict the defendants of tax evasion for each tax year pursuant to 26 U.S.C. § 7201, the government was required to prove at trial the following elements beyond a reasonable doubt for each tax year and count:

(1)    Defendants engaged in at least one "affirmative act" constituting an attempt to evade or defeat a tax;

(2)    Defendants in fact had an additional tax due and owing for that year; and

(3)    Willfulness.

See *Sansone v. United States*, 380 U.S. 343, 351 (1965); *Spies v. United States*, 317 U.S. 492, 497-99 (1943).

For purposes of proving tax evasion, an "affirmative act" is "any conduct, the likely effect of which would be to mislead or to conceal." *Spies*, 317 U.S. at 499.  The Supreme Court "[b]y way of illustration, and not by way of limitation," set out examples of what can constitute an "affirmative willful attempt" to evade, in the *Spies* case:

> [K]eeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.

317 U.S. at 499. Even an activity that would otherwise be legal can constitute an affirmative act supporting a Section 7201 conviction, so long as the defendant commits the act with the intent to evade tax. *See United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir. 1996).

With respect to proving a tax due and owing, it is not necessary to charge or prove the exact amount of the tax that is due and owing. *United States v. Thompson*, 806 F.2d 1332, 1335-36 (7th

16

Cir. 1986); *United States v. Harrold*, 796 F.2d 1275, 1278 (10th Cir. 1986); *United States v. Citron*, 783 F.2d 307, 314-15 (2d Cir. 1986); *United States v. Buckner*, 610 F.2d 570, 573-74 (9th Cir. 1979); *United States v. Marcus*, 401 F.2d 563, 565 (2d Cir. 1968).  It is enough to prove that a defendant attempted to evade a substantial income tax even though the actual amount of tax that he or she owes may be greater or less than the amount charged in the criminal case.

Importantly, as it pertains to the defendants' contentions in their post-trial motions, the tax deficiency at issue need not be for taxes due and owing by each defendant individually; the deficiency may be for taxes due and owing by another taxpayer, as a defendant may attempt to evade the assessment or payment of taxes of another, or aid and abet the evasion of someone else's taxes. *See United States v. Wilson*, 118 F.3d 228, 231, 236 (4th Cir. 1997) (attorney convicted of attempting to evade a client's taxes); *United States v. Townsend*, 31 F.3d 262, 264, 266-67 (5th Cir. 1994) (Section "7201 is not limited to prosecutions of those who evade taxes that they may owe themselves, but rather it encompasses prosecutions of any person who attempts to evade the tax of anyone").

As described in detail above, the evidence at trial showed that each defendant participated in a sustained and prolonged tax fraud scheme and conspiracy relating to income earned at the Dippin Donut stores, a scheme that involved evading not only their own individual income taxes, but the aiding and abetting of evasion of each other's income taxes.  They did so by, among other things, willfully causing their tax preparer to file false individual and corporate income tax returns concealing the Dippin Donuts stores' true cash receipts and the defendants' true income from the stores; depositing cash receipts from the stores directly into their own personal bank accounts instead of the stores' designated business bank accounts; paying personal expenses in cash; and providing and causing to be provided to their return preparers false, misleading, and incomplete

17

information.  The proof of a tax due and owing for each defendant was overwhelming, and the jury was entitled to consider as unreported income the diverted cash deposits into the defendants' personal bank accounts.  *E.g.*, Tr. 994:16-1019:2; Govt. Exs. 353-A through 353-L; 354; 355-A through 355-D; 358-59.

Despite the overwhelming evidence in support of the defendants' guilty verdicts as to Counts 2-5, the defendants move for acquittal.  Their motions concerning these counts are without merit.

### i.  Counts 2-5:  Tax Evasion Concerning John/Helen's Taxes

#### 1.  John and Helen's Motion for Acquittal Should be Denied

Counts 2-5 charge tax evasion as to the individual income tax returns of John and Helen Zourdos for tax years 2013 through 2016, and the trial evidence sufficed for a reasonable jury to convict each defendant on each of these counts.  John and Helen argue that the evidence does not suffice for three reasons: (1) Vincent Gilroy got the information for the personal tax returns from the payroll company and from Helen; (2) Gilroy "did not sit down and review the tax returns" with John; (3) the returns were usually dropped off at Dippin Donuts or delivered by fax; and (4) "[n]o one ever reviewed" the returns received from Gilroy, which were "put inside the filing cabinet." Dkt. No. 106-1 at 13. These arguments do not undermine the strength of the evidence as to the evasion counts against John and Helen.

Gilroy and O'Rourke testified that John and Helen told them all the sales proceeds earned by Dippin Donuts went into the corporate bank accounts of the three stores, Tr. 482:16-483:7; 491:3-10; 540:5-12; 586:2-587:22, which explained why the accountants relied on the information provided by the defendants (chiefly, the corporate bank statements) and by the payroll company to prepare John and Helen's tax returns. And although Gilroy did not sit down with John and Helen

every year to review their personal tax returns, he did send them Forms 8879 every year, which showed how much – in reality, how little – income was claimed on the tax returns, which were transmitted to the defendants with the 8879 forms, which John and Helen signed under the penalty of perjury, thereby authorizing Gilroy to file their personal returns. Tr. 517:4-19; 521:16-20; 608:25-612:25; 614:7-615:4; 1129:10-18; 1149:9-1155:7; *e.g.*, Govt. Exs. 173-C; 196-B.  John Zourdos admitted on cross-examination that he received the Forms 8879, signed them himself, and saw on those forms the income amounts reported on his tax return. Tr. 1149:9-1154:21.

When John and Helen leased a Corvette in 2015, they filled out a finance application in which Helen listed her annual income as $78,000, and John listed his annual income as $150,000. Tr. 842:3-845:7; Govt. Ex. 321-C.  By contrast, they claimed combined wages and salaries of just $58,850 on their joint 2014 tax return, and $56,700 on their 2015 joint tax return. *See* Govt. Exs. 1-D; 1-E.  John and Helen knew how much money they were making, and they took great pains to take a large portion of their wages from the donut stores in cash to keep their true income from appearing on their tax returns. Specifically, they took cash from the business and dispersed it among multiple bank accounts, which evidently required so much paperwork that they paid Kathryn Adams to help them fill out the deposit slips, *see* Tr. 239:13-274:17, enabling them to keep Gilroy and O'Rourke (and, by extension, the IRS) from learning about it. John testified, implausibly, that Gilroy suggested he take cash out of the business directly to avoid "double taxation," Tr. 1118:2-23, but, in fact, John and Helen evaded *all* taxation on the cash diversions, which is why they did not disclose these diversions of cash sales to their accountants.

After John and Helen were separately interviewed by IRS agents in August 2017, they almost immediately stopped depositing cash into their personal accounts, and they increased their reported wages, demonstrating their knowledge that the cash going into their personal accounts

was income, which they knew how to report (and change) on the books when desired. Tr. 1019:3-1026:11; Govt. Ex. 365.

Failing to give bank statements from their personal accounts to their accountants was an important part of the defendants' scheme. Tr. 483:10-17; 487:23-489:23; 575:4-17; 586:19-22. At trial, one of the defenses was that the personal bank statements were in the office at Dippin Donuts and should have been found and retrieved by Heather O'Rourke when she picked up other records, Tr. 21:11-22:1; 1123:7-1126:20, but the trial testimony indicated that deposit items – the underlying details of each deposit – are not included with monthly bank statements and must be separately requested, *see* Tr. 308:12-310:9, and John admitted on cross-examination that he neither had those deposit item details nor provided them to his accountants, Tr. 1163:9-1164:8. Thus, even if she had the personal account statements, O'Rourke could not have reconciled them without further information from John and Helen about the specific deposits.

Taken together, the trial evidence showed that John and Helen Zourdos knew how much money they were making, and a reasonable jury could conclude that they hid their true incomes from their accountants and from the IRS and then knowingly and willfully authorized Gilroy to file personal tax returns that materially underreported their income for tax years 2013-2016.

## 2. **Dimitrios's Motion for Acquittal Should be Denied**

Defendant Dimitrios Zourdos contends that the record was insufficient to support his convictions on Counts 2 through 5, arguing almost exclusively that he cannot be guilty of tax evasion concerning his parents' income tax returns where he neither saw the returns nor helped prepare them. Dimitrios is incorrect on both the law and the facts. As charged in the Indictment, the affirmative acts of evasion included not only the preparation and filing of false tax returns, but

the "depositing and causing to be deposited unreported cash receipts from Dippin Donuts into personal accounts instead of designated business accounts." Dkt. No. 1 ¶ 18.

Dimitrios did exactly that by depositing unreported cash directly into his parents' personal bank accounts (in addition to his own), thus helping them hide their income. *See, e.g.*, Tr. 151:24-152:5; 253:4-13; 327:17-342:24; 789:2-15; Govt. Ex. 61-B at 27. A bank teller at NBT testified that Dimitrios made cash deposits to NBT accounts where his parents and his sister – but not him – had personal bank accounts. Tr. 328:23-329:9; 342:20-343:1; 346:17-22. His diversions and cash deposits into his own accounts occurred on a regular basis, which is consistent with the weekly payroll maintained by Dippin Donuts, Tr. 991:24-993:14; Govt. Exs. 351-A; 351-B, while he helped his parents with their evasion scheme during their annual trips to Greece by making deposits to their accounts while they were away, *see* Tr. 346:17-22. Indeed, multiple witnesses testified that Dimitrios ran all three stores, including handling cash deposits and cash payroll, when his parents were in Greece. Tr. 97:25-99:8; 125:11-126:1; 151:6-152:5; 245:16-246:8; 351:14-352:1; 357:8-13; 395:22-396:22; 420:8-421:2; 790:22-791:6. Thus, the record supports a rational finding that Dimitrios directly and willfully participated in committing affirmative acts that furthered his parents' tax evasion.

In addition, Dimitrios's motion fails to recognize the theory of prosecution, supported by the law and the trial record, that he aided, abetted, or otherwise knowingly and willfully caused his parents to commit tax evasion through his own acts. As discussed above, one can evade, or aid and abet the evasion, of another's income taxes. *See Wilson*, 118 F.3d at 236; *Townsend*, 31 F.3d at 266-67. Consistent with law, the Indictment charges Dimitrios in Counts 2-5 with aiding and abetting his parents' tax evasion, *see* Dkt. No. 1 ¶ 18 (charging 18 U.S.C. § 2), and the Court properly instructed the trial jury on aiding and abetting law:

Under the aiding and abetting statute, it is *not necessary for the government to show that a defendant physically committed the crime* with which he or she is charged in order for the government to sustain its burden of proof. A person who aids or abets another to commit a crime is just as guilty as if he or she committed it themselves.

Accordingly, you may find a defendant guilty of the offense charged if you find beyond a reasonable doubt that the government has proven that another person actually committed the offense, and that the defendant under consideration aided or abetted that person in the commission of the offense.

. . .

*In order to aid or abet another to commit a crime, it is necessary that the defendant under consideration willfully and knowingly associate himself or herself in some way with the crime, and that he or she willfully participated in the crime by doing some act to help it succeed.*

To establish that the defendant knowingly associated himself or herself with the crime, the government must prove beyond a reasonable doubt that the defendant knew that another defendant was attempting to avoid his or her taxes.

To establish that defendant willfully participated in the commission of the crime, the government must prove that the defendant engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime. . . .

. . . An aider and abettor must know that the crime is being committed and act in a way that is intended to bring about the success of the criminal venture.

Dkt. No. 109 at 42:23-44:18 (emphasis added).[8]  The government may use circumstantial evidence

to establish an aider and abettor's intent.  *United States v. Spinney*, 65 F.3d 231, 235-37 (1st Cir.

---

[8] The transcript of this Court's final jury charge was ordered and later docketed separately from the rest of the trial transcript, so its pagination is not continuous. Accordingly, references in this brief to this Court's final jury charge are preceded by "Dkt. No. 109."

1995); *United States v. Castro*, 887 F.2d 988, 995-96 (9th Cir. 1989). Further, the government is not required to show that the aider and abettor knew every detail of the underlying crime. *United States v. Perez*, 922 F.2d 782, 785 (11th Cir. 1991); *Campbell v. Fair*, 838 F.2d 1, 4-5 (1st Cir. 1988); *United States v. Smith*, 832 F.2d 1167, 1170 (9th Cir. 1987); *United States v. Torres*, 809 F.2d 429, 433 (7th Cir. 1987); *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980).

Here, the evidence showed that Dimitrios was an essential player in the tax fraud scheme. He managed the Black River Boulevard store, where he counted the cash drawers and recorded the cash skim in calendar sales notebooks. Tr. 97:7-21; 150:8-151:5; 360:15-362:21; 364:25-366:19; 802:1-804:10. Multiple witnesses testified to his handwriting all over the calendar notebooks, recording the "skim," for many years. Tr. 360:15-362:21; 364:25-366:19; 802:1-804:10; Govt. Exs. 129-B; 130-A; 130-B. Dimitrios made cash deposits to the business bank accounts like his parents, Tr. 151:24-152:5; 245:6-15; diverted unreported cash sales to his personal accounts and those of his parents (and of Rose), *see See, e.g.*, Tr. 151:24-152:5; 253:4-13; 327:17-342:24; 789:2-15; Govt. Ex. 61-B at 27; and paid employees partially in cash, Tr. 100:20-102:11; 357:8-13; 789:2-13. On top of all this, Dimitrios managed the entire Dippin Donuts operation, including all three stores – and thereby kept the tax evasion conspiracy going – while his parents were away in Greece every year. Tr. 97:25-99:8; 125:11-126:1; 151:6-152:5; 245:16-246:8; 351:14-352:1; 357:8-13; 395:22-396:22; 420:8-421:2; 790:22-791:6.

On these facts, a jury could rationally conclude that Dimitrios was intimately involved in the entire tax fraud scheme over many years. The diversion of cash receipts into multiple personal accounts for him and his parents was designed to evade taxes for himself and his parents, which is why the defendants did not take the simpler route of depositing all of the cash earned by Dippin Donuts into the corporate bank accounts.

23

That Dimitrios is criminally liable for evading his parents' taxes without being directly involved in one element of that evasion – tax preparation – is consistent with the very nature of criminal conspiracies and the rationale behind aiding and abetting law.  Criminal conspiracies such as the one in this case often involve many moving parts and different players, each with their own roles but each pursuing a common criminal objective, which in this case was tax evasion.  To be found guilty, each conspirator need not be involved in committing every overt act, or every affirmative act of evasion – indeed, they need not even be aware of every act carried out by co-conspirators and aider/abettors to be found guilty of willfully pursuing a common unlawful objective.  *See United States v. Brunetti*, 615 F.2d 899, 903 (10th Cir. 1980); *see also Perez*, 922 F.2d at 785; *Fair*, 838 F.2d at 4-5; *Smith*, 832 F.2d at 1170; *Torres*, 809 F.2d at 433; *Sampol*, 636 F.2d at 676.

Here, there was no need for Dimitrios to be involved in tax preparation, as his parents were already taking the lead in dealing with the accountants.  But evidence of his own substantial role in the scheme, outlined above, was more than enough for a jury to rationally infer and conclude that he knew he was aiding his parents' tax evasion as well as his own, since the diversion of cash from the donut stores to personal bank accounts was designed to prevent the accountants (and the IRS) from obtaining complete and accurate income information.[9]

_____

[9] Dimitrios relies on *United States v. Cassese*, 290 F. Supp. 2d 443 (S.D.N.Y. 2003), a securities fraud case in which the district court ordered judgment of acquittal. There, the district court found insufficient evidence to conclude the defendant knew at the time of his stock trades that a lucrative tender offer for the company was pending. *Id.* at 452.  But *Cassese* is factually distinguishable because the evidence here is very substantial that Dimitrios participated in a multi-year conspiracy in which he paid employees (and himself) under the table and even helped his parents pay themselves under the table *via* cash deposits into their personal accounts, all while assisting in

(continued...)

### ii.  **Counts 6-8:  Tax Evasion Concerning Dimitrios Zourdos' Taxes**

#### 1.  **Dimitrios's Motion is Without Merit**

Counts 6 through 8 of the Indictment charge all three defendants with tax evasion, and the aiding and abetting thereof, with respect to the individual income taxes of defendant Dimitrios Zourdos, for the tax years 2014 through 2016, in violation of Title 26, United States Code, Section 7201 and 18 U.S.C. § 2. Dkt. No. 1.

The trial evidence was more than sufficient for a reasonable jury to convict all three defendants of tax evasion with respect to Dimitrios's individual income tax returns for calendar years 2014 through 2016.  Dimitrios argues he could not be convicted for filing false personal income tax returns because he was not directly "engaged" with the accountants who prepared his tax returns. Dkt. No. 107 at 10-13. While Dimitrios did not meet with his accountants or discuss his personal tax returns with them, *see* Tr. 521:3-10, such individual meetings are not among the elements of the offenses charged, and Dimitrios has cited no law holding otherwise.  O'Rourke testified that she would prepare Dimitrios's personal income tax return and drop it off at the HZ Dippin store and would later "receive the signed copy back." *Id*. She also testified that the Form 8879 and corresponding state income tax electronic filing form "are always on top because we need those back in order to file" the returns. Tr. 521:16-20. Each Form 8879 listed the income information on the previously prepared tax return and indicated that the taxpayer's signature on the form certifies to the accuracy of the return and authorizes the tax return preparer to file it,

---

keeping (and, later, doctoring) a second set of books.  Again, given the nature of the cash diversion scheme and Dimitrios's direct participation in it over a period of many years, a reasonable jury could conclude beyond a reasonable doubt that he did willfully aid his parents in hiding their income and did know false tax returns were being prepared and filed.

25

subject to the pains and penalties of perjury for the taxpayer. *See* Tr. 610:7-612:25; 1153:16-1154:21. The Forms 8879 signed by Dimitrios for tax years 2014 and 2015 are thus direct evidence of his having authorized, after full disclosure by his accountants, the filing of materially false personal income tax returns for those years. *See* Tr. 522:14-19; 621:9-623:24.; Govt. Exs. 3-D; 3-E; 182-B; 190-B. With respect to the 2016 tax year, the jury could reasonably infer from the trial testimony and the certified copy of the submitted tax return for Dimitrios for that year, *see* Govt. Ex. 3-F, that Dimitrios authorized Gilroy to file the return after receiving it and being made aware of the income amount claimed, which was false. Dimitrios was aware of the falsity of the information on all of the personal income tax returns at issue because he was receiving a significant portion of his compensation for working at Dippin Donuts in cash, under the table.

In addition, as noted in more detail above, Dimitrios committed additional affirmative acts of evasion by withholding cash sales from business accounts, and by diverting and depositing that cash into his own personal accounts year after year.  A rational jury, applying their common sense, could conclude beyond a reasonable doubt that this activity showed Dimitrios's willfulness in concealing income from the IRS in order to evade taxes.

Dimitrios further claims that there was "a compelling basis for the jury to conclude Dimitrios believed the cash and check deposits he received from his parents were gifts that did not need to be reported as income." Dkt. No. 107 at 15. This defense was fully and fairly aired at trial, *see* Tr. 34:12-35:25; 1035:10-1036:3; 1075:20-1076:3; 1122:13-15; 1295:17-1298:25, and it was rejected by the jury. In the light most favorable to the guilty verdicts – the applicable standard at this stage – the jury was not "compelled" to agree with Dimitrios's defense. As manager of the Black River Boulevard store, Dimitrios kept the second set of books at that store, Tr. 97:7-21; 150:8-151:5; 360:15-362:21; 364:25-366:19; 802:1-804:10, and he was evidently involved in

doctoring those books, as decimal points began to appear in entries made in his handwriting beginning almost immediately after the accountants (and the IRS) were first made aware of these calendar books, Tr. 366:15-367:5; 804:5-14. Dimitrios knew that he was receiving cash directly from the business, Tr. 253:4-13; 327:17-342:24; 789:2-15, and he would often deposit that cash along with his paycheck, much like the employees who received some of their pay under the table, Tr. 991:9-994:15. Dimitrios's on-the-books paycheck went up almost immediately after his parents were interviewed by the IRS, Tr. 1020:23-1024:10, and after these interviews Dimitrios himself (with one exception) immediately stopped making cash deposits into his personal account, Tr. 1020:23-1022:13; Govt. Ex. 365. A reasonable jury could infer that Dimitrios stopped making cash deposits because he knew such deposits constituted evidence of income, which he wanted to hide. Dimitrios's arguments to the contrary are merely "a futile attempt to rehash his closing argument." *See Voigt*, 89 F.3d at 1091.

Dimitrios's receipt of other gifts from his parents, which were not calculated as part of the evasion counts for purposes of his tax due and owing (such as the house his parents apparently gave him), and his parents' purported inequitable distribution of gift money to his sister, Rose, are irrelevant here.[10] The jury had a basis for concluding that Dimitrios deserved, earned, and received more than his minimal on-the-books paychecks for all his managerial work at Dippin Donuts, and

---

[10] In any event, the jury had reason to doubt Rose's testimony that the money she received from her parents was unrelated to her work at Dippin Donuts after she was cross-examined about text messages with her mother, Helen Zourdos, indicating that Rose was expected to work at Dippin Donuts even when she did not want to. Tr. 1094:17-1102:1. However, even if all the cash Rose received from Dippin Donuts was a gift from her parents, that does not mean that Dimitrios – whose managerial role at Dippin Donuts was well-established at trial – was necessarily treated the same way.

that he knew the cash he received from the register drawers was part of his overall compensation and was separate and apart from other gifts he would occasionally receive from his parents.

### 2.  **John and Helen's Motion is Without Merit**

The jury properly, and rationally, convicted John and Helen Zourdos of aiding and abetting Dimitrios's tax evasion based on the overwhelming evidence that they both carried out and managed a years-long tax evasion scheme, which included, as one element, causing the diversion of unreported cash wages into Dimitrios's bank accounts, thus causing a substantial understatement of income on his Forms W-2, upon which Gilroy and O'Rourke relied in preparing his personal income tax returns.

John and Helen claim there was insufficient evidence to support their convictions on these counts because section 7201 requires proof of willfulness, which is the "intentional violation of a known legal duty." *See Cheek v. United States*, 498 U.S. 192, 200-01 (1992). John and Helen thus contend their convictions cannot be sustained as to Dimitrios's personal returns because they had no "legal duty with regard to the individual income tax returns of Dimitrios Zourdos for the years 2013 through 2015." Dkt. No. 106-1 at 3. This argument misconstrues the law, this Court's jury instructions, and the facts. Again, it is well settled that defendants may be found guilty of attempting to evade someone else's taxes for which they themselves have no legal duty to file or pay. *See Wilson*, 118 F.3d at 236; *Townsend*, 31 F.3d at 266-67. John and Helen may not have had a legal duty to ensure Dimitrios prepared his taxes accurately, but they knew *he* had such a legal duty, and they willfully helped him violate that duty by orchestrating a years-long tax fraud conspiracy and scheme which included the diversion of unreported cash wages into Dimitrios's personal bank accounts. They were also aware that Dimitrios received undeposited cash from the businesses and spent it on luxury items such as the restoration of a 1963 Ford Galaxie. *See* Govt.

28

Exs. 162; 400-G.  Helen also managed preparation of Dimitrios' tax returns through Gilroy, Tr. 614:17-23, and she and Dimitrios both knew Gilroy was getting copies of Forms W-2, which substantially understated Dimitrios's wages and income through their actions in diverting unreported cash wages into his bank accounts.  Govt. Exs. 3-D at 41; 3-E at 44; 3-F at 31.

In support of his motion, John contends that he was not directly involved in the preparation of Dimitrios's individual tax returns, as Helen coordinated with Gilroy to provide the relevant wage and income documentation.  Dkt. No. 106-1 at 4-5.  But the tax evasion counts in the Indictment charge multiple affirmative acts of evasion, not just the preparation and filing of false tax returns.  Dkt. No. 1 ¶ 21.  John Zourdos committed affirmative acts in support of Dimitrios's tax evasion by personally diverting and depositing cash into Dimitrios's bank accounts.  *E.g.*, Tr. 251:14-253:6; Govt. Exs. 72-B at 35-37; 405.  John also personally managed the payroll and paid employees in cash "under the table," *see* Tr. 99:23-104:3; Tr. 138:18-139:24; 348:12-358:5; 400:8-402:16; 422:18-424:15; 757:13-758:22, indicating his knowledge that Dimitrios also received his pay this way. Additionally, Dippin Donuts provided understated hours and wage information to Payco, the third-party payroll processor, resulting in the generation of false Forms W-2, including for Dimitrios, and the filing of false quarterly employment tax returns.  *See* Tr. 906:18-907:1; 910:4-16; 918:18-924:14; 1141:20-1144:19.

Based on this evidence, the jury, properly instructed by the Court, rationally concluded that John Zourdos willfully aided and abetted Dimitrios's tax evasion.  Again, as the Court instructed the jury: "[I]t is not necessary for the government to show that a defendant physically committed the crime with which he or she is charged in order for the government to sustain its burden of proof. . . . . In order to aid or abet another to commit a crime, it is necessary that the defendant under consideration willfully and knowingly associate himself or herself in some way with the

crime, and that he or she willfully participated in the crime by doing some act to help it succeed." Dkt. No. 109 at 42:23-43:22.

John Zourdos willfully and knowingly associated himself with the crime, and through his own actions helped it succeed. A college graduate with a degree in accounting, *see* Govt. Ex. 330, John helped Dimitrios commit tax evasion by participating in the entire scheme from beginning to end, including by depositing only a portion of the cash sales into designated corporate bank accounts, knowing that Gilroy and O'Rourke only received and used the corporate business bank account information to calculate sales, which John admitted to a federal agent; Tr. 850:24-858:11; 1156:18-1158:22; recording the diverted cash skim in a "double set" of books in the form of calendar notebooks, *e.g.*, Tr. 362:22-363:14; Ex. 130-A at 129; helping distribute the cash payroll, Tr. 99:23-104:3; Tr. 138:18-139:24; 348:12-358:5; 400:8-402:16; 422:18-424:15; 757:13-758:22; and making partial cash deposits to business accounts, Tr. 151:24-152:5; 350:25-351:5; 398:14-15; 858:5-11. No aspect of this scheme, including the cash that went to Dimitrious under the table, escaped John's awareness and direct or indirect involvement.

Defendants John and Helen Zourdos further contend they are entitled to acquittal on Counts 6 through 8 because the cash given to Dimitrios was a gift such that Dimitrios had no unreported income and thus no tax due and owing, which is an essential element of an evasion charge. Dkt. No. 106-1 at 6. But, again, a rational jury could conclude that John and Helen's diversion of cash directly into Dimitrios's bank accounts from Dippin Donuts demonstrated their knowledge that the cash was never reported as sales and that the cash was compensation to Dimitrios for his operation and management of the most profitable store in the Dippin Donuts chain. If Helen and John intended to give the money to Dimitrios as a gift from themselves, they could have deposited all the cash sales into their corporate accounts first, and they then could have cut checks directly

to Dimitrios (and accounted for them as draws to themselves) or given him money from their personal accounts, after accounting for it as income to themselves. They chose neither approach. Instead, John and Helen paid Dimitrios by diverting cash sales to him under the table, just like they did for their other employees, in order to conceal the payments. A rational jury could conclude that this clandestine method of paying Dimitrios shows the payments were not gifts: the cash Dimitrios received was income, and in hiding those payments, John and Helen sought to help Dimitrios avoid paying taxes on that income.

Importantly, John and Helen did not even always pay Dimitrios directly, as he paid himself under the table cash wages. In fact, as the evidence showed at trial, Dimitrios would often deposit substantial cash directly from undeposited register sales along with his miniscule paychecks – essentially wrapping his paycheck with a bundle of unreported cash just like he, Helen, and John did for their employees. *See* Tr. 991:9-994:15; Govt. Exs. 66-C; 351-B. That Dimitrios paid himself in this fashion supports the jury's rational finding that the cash payments and deposits to Dimitrios represented under-the-table income, and that John and Helen's involvement in this scheme aided and abetted Dimitrios's evasion of taxes.

Finally, as noted above, the fact that the defendants increased their reported wages *immediately after* agents interviewed John and Helen in August 2017 shows that the payments during the conspiracy period represented income and wages and not gifts. As Christine Zakris-Carpenter testified, the investigating agents did not even know in August 2017 when they interviewed John and Helen that cash sales were being diverted directly into personal accounts. Tr. 861:17-862:15. As a result, they did not ask questions about cash diversions into personal accounts. *Id.* Yet on the very day Helen was interviewed, August 29, 2017, Helen, Dimitrios, and Rose, unprompted by any interrogation into such conduct, immediately stopped depositing cash

31

into their personal accounts and instead began substantially increasing their reported wages.  Tr. 1020:23-1024:10; Govt. Ex. 365.  A rational jury could certainly find such conduct not only powerful evidence of collusion, conspiracy, and consciousness of guilt, but also proof that Helen, John, and Dimitrios viewed the cash payments to Dimitrios as income and compensation for services rendered.  If such payments were gifts, John and Helen would have continued the payments without increasing reported wages.  They did not do so because they knew that the cash diversions were a way to compensate Dimitrios for his important role running the businesses and were paid in cash to help him hide income from the IRS.

### c.   <u>Counts 9 through 15: Aiding/Assisting in the Filing of False Returns (26 U.S.C. § 7206(2))</u>

Counts 9 through 15 of the Indictment charged each defendant with aiding and assisting in the preparation of false corporate tax returns for HZ Dippin for the tax years 2013 through 2016, and for RDZ Dippin for the tax years 2013 through 2015.  Dkt. No. 1 ¶ 23.  As alleged, the defendants willfully falsified those returns by substantially understating cash sales and receipts earned at the Dippin Donut stores, reportable at Line 1, "gross receipts and sales," of each return. *Id.*

To convict a defendant of aiding and assisting in the preparation and filing of false returns, in violation of 26 U.S.C. § 7206(2), the government was required to prove at trial the following elements beyond a reasonable doubt:

(1)   the defendant aided or assisted in, procured, counseled, or advised the preparation or presentation of a document in connection with a matter arising under the internal revenue laws;
(2)   the document was false as to a material matter; and
(3)   the defendant acted willfully.

*United States v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001).  Willfulness in tax fraud cases "generally connotes a voluntary, intentional violation of a known legal duty." *United States v. Bishop*, 412 U.S. 346, 360-61 (1973); *see also Cheek*, 498 U.S. at 200-01; *United States v. Ervasti*, 201 F.3d 1029, 1040-41 (8th Cir. 2000).

Section 7206(2) is often used to charge tax return preparers, but it may also be used to charge the underlying taxpayers, particularly where the taxpayers provided false or incomplete information to a third-party tax return preparer, who then prepared and filed the return with authorization from the taxpayers.  *United States v. Hirschfeld*, 964 F.2d 318, 321 (4th Cir. 1992); *United States v. Greger*, 716 F.2d 1275, 1277-78 (9th Cir. 1983), *cert. denied*, 465 U.S. 1007 (1984).

The defendants' motions for acquittal on Counts 9-15 which should be denied for the reasons described below.

### i.  <u>John and Helen's Motion Is Without Merit</u>

John and Helen claim the jury irrationally convicted them on these counts for several reasons.  John first claims he had no role in tax return preparation, was not listed as a corporate officer, director or shareholder of the corporations in question, and did not sign the corporate returns. Dkt. No. 106-1 at 7-8.  Here, again, this argument misconstrues the law and the evidentiary record.  Subscription and signature is not an element of a section 7206(2) charge, nor is direct participation in the tax return preparation process.  Section 7206(2) is an aiding and abetting charge requiring only proof that the defendant "willfully . . . aids or assists in, or procures, counsels, or advises the preparation or presentation . . . of a return." 26 U.S.C. § 7206(2).  The statute "reaches all knowing participants in the fraud." *United States v. Clark*, 577 F.3d 273, 285 (5th Cir. 2009); *see also United States v. Fletcher*, 322 F.3d 508, 514 (8th Cir. 2003).  Thus, courts have held that

anyone who willfully *causes* a false return to be filed or furnishes information which leads to the filing of a false return can be guilty of violating Section 7206(2). *See, e.g.*, *United States v. Clark*, 139 F.3d 485, 489-90 (5th Cir. 1998) (rejecting insufficiency claim by defendants who counseled taxpayers to claim excess exemptions on Forms W-4). There need not be actual preparation of the return if the evidence demonstrates that the defendant provided aid, assistance, and advice in the preparation of the false tax return or took other actions that caused the filing of a false and fraudulent return. *See United States v. Smith*, 424 F.3d 992, 1010-11 (9th Cir. 2005). The question is whether the defendant consciously did something that led to the filing of the false return. *See United States v. MacKenzie*, 777 F.2d 811, 820 (2d Cir. 1985) (defendants' conviction under § 7206(2) with respect to employees' tax returns upheld even though they "had nothing to do with the preparation of the tax returns of the employees" where defendants issued false Forms W-2 to the employees, knowing they would be used to file false returns); *United States v. Crum*, 529 F.2d 1380, 1381-82 (9th Cir. 1976); *United States v. Maius*, 378 F.2d 716, 718 (6th Cir. 1967).

The Sixth Circuit in *Searan* explained that section 7206(2) is an aiding and abetting statute:

> This court long ago recognized that the "willfully aiding, assisting, procuring, counseling, advising, or causing" language of § 7206(2) effectively incorporates into this statute the theory behind accomplice liability. In *Sassak*, this court observed that, "[t]heoretically, anyone who causes a false return to be filed or furnishes information which leads to the filing of a false return could be guilty of violating 26 U.S.C. § 7206(2)." *Sassak*, 881 F.2d at 277. In order to avoid the harsh and probably unintended consequences of such strict liability, *Sassak* followed the Third Circuit in holding that "one must engage in 'some affirmative participation which at least encourages the perpetrator' in order to be guilty of aiding in the preparation and presentation of false tax returns." *Ibid.* (quoting *United States v. Graham*, 758 F.2d 879, 885 (3d Cir.1985)). *Sassak* explained: courts should "analyze violation of 26 U.S.C. § 7206(2) in terms of an actor's actual willfulness and knowledge of the falsity of the return that is prepared." *Sassak*, 881 F.2d at 278. *Sassak* thus interpreted § 7206(2) as incorporating the complicity theory of

34

> criminal liability set forth more fully in 18 U.S.C. § 2 and its
> interpretive jurisprudence. We reaffirm that principle today and look
> to 18 U.S.C. § 2 caselaw for an understanding of what Congress
> criminalized with the inclusion of the 'aiding, assisting, procuring'
> language in 26 U.S.C. § 7206(2).

259 F.3d at 443.  Here, this Court's instructions were consistent with this law as to § 7206(2)

liability, Dkt. No. 109 at 46:5-48:11, and aiding abetting liability generally, *id.* at 42:23-45:9.

A rational jury could easily find that John (and Dimitrios, as described, *infra*) willfully

helped cause the preparation and presentation of false corporate tax returns to the IRS even if

Helen took the lead in coordinating the return preparation with the accountants.  To begin, John

*did* directly participate in preparation of the corporate tax returns, as O'Rourke and Gilroy testified.

Tr. 484:11-485:7.  When they had questions, O'Rourke and Gilroy sometimes spoke with John.

*See id*.  Further, Gilroy provided John and Helen the prepared corporate tax returns, which

understated cash sales by millions of dollars.  Tr. 585:21-586:18.  John admitted to agents that he

only gave the accountants the business bank account records, Tr. 850:24-858:11, and filed

corporate tax returns seized during the search warrant confirmed John's knowledge of the content

of these returns and that he caused them to be filed with false sales information,  Tr. 218:11-238:24;

Govt. Exs. 137-A thru 137-K.

In addition, as outlined in more detail above, the substantial evidence showed that John

managed the tax fraud conspiracy for many years by recording the skim in the calendar books,

then personally made partial cash deposits to the business accounts – diverting the rest of the cash

to his and Helen's personal accounts, as well as to his children's accounts. The evidence also

showed he paid employees in cash directly from sales, knowing the accountant would never get a

record of those sales and cash payments. *See* Tr. 99:23-104:3; 138:18-139:24; 348:12-358:5;

400:8-402:16; 422:18-424:15; 757:13-758:22; 881:22-887:13.  Thus, a reasonable jury could infer

35

that in handling their financial affairs – deliberately withholding millions in cash deposits from business accounts, and diverting $1.7 million in cash into personal accounts, not to mention the undeposited cash expenditures and hoarding – John and Helen willfully caused their tax return preparer to preparer false and fraudulent corporate tax returns that omitted substantial gross sales and receipts.

John and Helen also argue that their interactions with the accountants about the corporate tax returns were brief, in that O'Rourke merely picked up the records at the donut shop on Erie Boulevard, taking a few minutes, and never discussed with John any issues about corporate receipts. Dkt. No. 106-1 at 8. The length of time O'Rourke spent at the store is irrelevant, and this argument ignores the overwhelming direct and circumstantial evidence that both Helen and John knowingly provided their accountants only with the business bank account records that omitted substantial gross receipts, year in and year out. As O'Rourke and Gilroy testified, John and Helen represented to them that all receipts were deposited into the business accounts, Tr. 491:3-6; 540:5-12; 586:2-587:22, which is why O'Rourke used only these accounts to calculate total sales, Tr. 486:19-489:23. Gilroy testified that he provided the prepared corporate returns to John and Helen every year and generally went over them. Tr. 585:21-586:18.

Defendants further contend that the calendar notebooks accurately reflected true sales, and that the books and other documentation were allegedly left open on or in the desk in the office such that O'Rourke should have seen them when she picked up documents. Dkt. No. 106-1 at 8-9. In short, the defendants claim that if O'Rourke had only looked hard enough, she could have found information about the true sales of Dippin Donuts. This defense was made at trial, and the jury reasonably rejected it. To begin, no less then *three* witnesses corroborated each other in stating that defendants knowingly provided the accounts with just the business bank account records, and

not the calendar notebooks or personal bank account records, to calculate sales: Heather O'Rourke, Tr. 483:2-492:19; 510:6-23; 540:5-12; Vincent Gilroy, Tr. 574:16-594:8; and even John Zourdos, Tr. 850:24-858:11; 1156:18-1158:22. O'Rourke further testified that she was instructed to take records from a specific drawer; that the business accounts were the only documents left there for her; and that John sometimes watched her while she was in the office retrieving these records. Tr. 486:19-489:23. A rational jury could reject the defendants' suggestion that O'Rourke should have ransacked the office to find additional records.

Helen herself corroborated this, in her own way, when she lied to Agent Prilutsky during a voluntary interview by claiming, falsely, that all receipts from Dippin Donuts were deposited into the business bank accounts. Tr. 874:22-875:7. This false statement was probative evidence of Helen's consciousness of guilt and knowledge that the accountants were only getting the business accounts. If the truth was that Helen believed O'Rourke was getting or should have been getting the personal account statements as well, Helen would have had no reason to lie to the agents.

The jury was entitled to credit all this corroborative evidence, as well as the additional circumstantial evidence of the prolonged and sustained conspiracy and the manner in which John and Helen conducted their financial affairs, to conclude that John and Helen were hiding substantial cash receipts by, in part, deliberately aiding, assisting, and otherwise causing the preparation and filing of false corporate tax returns.

The jury was also entitled to apply their common sense in rejecting the defense argument that O'Rourke should have rummaged through the Erie Boulevard Dippin Donut office to find additional records, particularly since she and Gilroy both testified they were not retained to audit Dippin Donuts. Tr. 483:2-17; 499:7-21; 573:10-574:15; 594:9-596:23. And even if O'Rourke could have found more records in the Dippin Donuts office, the defendants knew the sales figures

on the returns were understated but signed the Forms 8879 anyway, showing their willfulness.  It would have been painstaking and expensive for O'Rourke to figure out and document total sales, based on the way the defendants disbursed cash from the registers, and Helen had already expressed a desire to cut accounting costs. *See* Tr. 503:20-504:5; 525:7-526:3. Even if O'Rourke had tried to trace the cash, she could not have done so even with the personal bank statements alone, which would not have shown the item-by-item deposit details, including the source of the deposit and whether it was cash, Tr. 308:12-310:9, and John admitted, when pressed, that he never requested or received the deposit details from the bank, Tr. 1163:9-1164:8.  Finally, the deposit details would still not have given O'Rourke all of the information she needed to prepare accurate tax returns based on the additional $1 million in cash diversions that the defendants never deposited in any bank accounts. Ultimately, the jury failed to credit the defense narrative that O'Rourke should have found all of the cash. This theory was advanced by John Zourdos and Rose Zourdos, both of whose credibility was called into severe question during cross-examination.

The defendants also attempt to rely on the IRS audit of RDZ Dippin in support of their motions. During that audit in 2016, they defendants turned over the calendar books for one year, and for just one donut store, with respect to an already filed (and falsified) corporate return for RDZ Dippin. According to the defendants, the production of these notebooks shows their good faith and lack of willfulness, and that O'Rourke was at fault for failing to ask questions about the entries. Dkt. No. 106-1 at 9.   But the jury could have rationally concluded that the defendants' conduct during and after the audit showed their determination to continue their tax evasion, for a number of reasons.

First, the jury rationally understood the crime involving the return under audit had already been committed, since the return had ben filed in or about April 2015 (a year before the audit

commenced).  Second, during the audit the IRS demanded production of source documents that would verify the total receipts received by RDZ Dippin. Because the defendants improperly failed to maintain the cash register receipts, they were forced, six months after the document request issued, to produce the only other source record available:  the calendar notebooks.  Tr. 633:8-646:8; 707:20-719:23; Govt. Exs. 19-B; 206-A; 206-C.  Third, the auditor, Susan Johnson, testified that the meaning of the entries in these calendar books was not fully clear.[11]  Tr. 731:8-733:15; 749:8-750:21.  Fourth, O'Rourke and Gilroy, as they testified, had no reason to review the calendar notebooks or ask what the entries meant because their job with respect to the tax return at issue was long finished by the time of the audit: they had already prepared and filed the return a year earlier, and they believed it was accurate because they trusted that John and Helen had told them the truth and had given them all necessary information and records.  Tr. 526:15-527:6; 547:5-548:3; 645:19-646:8.  Fifth, and finally, as noted above, the very week the defendants were forced to turn over their old calendar books for the audit, they began doctoring the calendar books for the current year (which were not turned over to the IRS) with decimal points, in an evident attempt to disguise their true sales in case of any future scrutiny. Tr. 366:15-367:5; 804:5-13; 940:18-945:25; 964:21-968:3; Govt. Exs. 130-B at 140-42; 402-G; 403-G.  Rather than stop their tax evasion and

---

[11] The defendants argue that Gilroy explained the calendar notebooks to Johnson, Dkt. No. 106-1 at 14, which was a point they stressed at trial as well, Tr. 1282:7-1285:15. Johnson's activity record, however, merely indicated that Gilroy told her he would need to stop by "to explain them," but the activity record did not describe what explanation was given, Govt. Ex. 19-B at 3, and Gilroy's testimony was that "the explanation was, here is the sales books for the year sales per day" and that he "didn't open them and . . . didn't go through them." Tr. 676:18-678:15. Johnson testified that she did not remember the conversation. Tr. 742:17-22; 743:13-16. Further, Gilroy and Johnson both testified they never understood the defendants were diverting money into personal accounts, Tr. 491:3-10; 540:5-12; 586:2-587:22; 734:3-19, so the jury could have reasonably concluded that any explanation of the calendar books that Gilroy did give Johnson was based on the false and misleading information he had received from John and Helen.

get right with the law, defendants effectively doubled down by attempting to disguise their sales figures using a code to conceal.  The full story of the calendar notebooks, then, does not show good faith on the part of the defendants but rather underscores their bad faith, from which a jury could rationally infer that the defendants were determined to commit tax evasion in spite of the ongoing audit.

The defendants finally argue against Counts 9 through 15 by rehashing the argument made at trial that John and Helen thought it legitimate to "sweep" cash sales directly into personal accounts to avoid the double taxation associated with C corporations.  Dkt. No. 106-1 at 10.  In support, John cites his own self-serving and uncorroborated testimony that Gilroy advised him to set up the donut shops as C corporations, not flow-through S corporations, and that Gilroy advised him to take any profits left over as cash compensation to himself to avoid double taxation.  *See id.* at 10-12. The jury rationally discredited this argument and testimony.  As three accountants testified, all cash receipts must be reported at the corporate level, whether the business is a C corporation or an S corporation. Tr. 559:10-560:20 Tr. 589:1-590:17; 695:9-696:19; Tr. 1013:22-1014:13; 1048:5-21. In other words, one cannot "sweep" and hide cash sales by keeping them off the books and diverting them into personal accounts. *Cf.* Tr. 1193:14-1195:2. The defendants did not avoid double taxation with their cash diversion: they avoided all taxation.  John Zourdos, a college graduate with a degree in accounting, knew he could not conceal cash sales and evade all taxation.  All defendants knew that by keeping cash sales off the corporate books and diverting them into 15 different personal accounts they were dispersing and concealing that cash income. And by keeping over $1 million in cash sales that they never deposited – which they spent on cars and other luxury expenditures and hoarded at their house – the defendants knew this was not a matter of taking advantage of lawful tax code provisions to limit double taxation.

The defendants could have "bonused out" year-end net profits from a C corporation to avoid double taxation, but these bonuses would have needed to be documented.  The evidence showed that John Zourdos knew how to account for such things, as he regularly wrote himself checks out of corporate accounts, which were deemed untaxable "loans" so that he could avoid reporting said amounts as "bonuses," which would have been taxable income.  *See* Tr. 636:19-640:2; Govt. Ex. 198-E at 34; Ex. 33-A at 18, 44.

Given the evidence admitted at trial, the jury was entitled to rationally reject John and Helen's explanations and defenses as to Counts 9-15.

### ii.  <u>Dimitrios's Motion Should be Denied</u>

Dimitrios contends, as he does in seeking acquittal on Counts 2 through 5 (evasion of his parents' taxes), that he could not have been found guilty of Counts 9 through 15 by any rational jury because he had no role in preparing the corporate tax returns and never even saw the corporate tax returns.  Dkt. No. 107 at 8-10.  Dimitrios also argues that he did not have a duty to verify the corporate tax returns because he was not a co-owner of any of the donut stores.  *Id.*  Thus, according to Dimitrios, the jury must have speculated that "[h]e was their son.  He must have known." *Id.* at 10.

The jury convicted Dimitrios not because he was the son of John and Helen but because, as the evidence summarized above showed, he was a central player in the conspiracy, in that he managed the Black River Boulevard store, Tr. 97:7-21; 150:8-151:5; recorded cash skims in calendar books that were never turned over to the accountants, *e.g.*, Tr. 362:5-21; 364:25-367:5; 802:4-804:10; Govt. Ex. 128-B; diverted cash receipts himself not only to his personal accounts but into family  members' accounts, Tr. 151:24-152:5; 253:4-13; 327:17-342:24; 789:2-15; paid employees under the table in cash, Tr. 101:6-102:11; 357:3-13; doctored sales books after an IRS

41

audit to conceal true sales, Tr. 366:15-367:5; 804:5-13; 940:18-945:25; 964:21-968:3; knowingly signed 8879 Forms authorizing the filing of his own false returns, *See* Tr. 522:14-19; 612:23-615:14; 621:9-623:24; Govt. Exs. 3-D; 3-E; 3-F; 182-B; 190-B; paid for a lavish lifestyle with cash he knew was undeposited and unreported, *e.g.*, Tr. 817:14-826:13; Govt. Exs. 162; 400-G; ran the entire Dippin Donut operation, including the tax fraud conspiracy, while his parents were away in Greece, Tr. 97:25-99:8; 125:11-126:1; 151:6-152:5; 245:16-246:8; 351:14-352:1; 357:8-13; 395:22-396:22; 420:8-421:2; 790:22-791:6; and that he did all of these things over several years.

In arguing against his convictions on Count 9-15, Dimitrios again misconstrues the law and the aiding and abetting theory under which he was prosecuted pursuant to section 7206(2). As noted above, section 7206(2) does not require proof that Dimitrios was an owner of the business; that he signed the tax returns at issues; or that he directly participated in tax return preparation. *See supra* at 20-24. So long as the evidence is sufficient to show that Dimitrios, through his own actions, willfully helped cause the preparation of false and fraudulent corporate returns – even if his parents were the ones who interacted with the accountants – he may be found guilty of violating section 7206(2) under an aiding and abetting theory. *See Searan*, 259 F.3d at 443.

A reasonable jury could conclude that Dimitrios's consistent participation in the tax fraud conspiracy as described above was designed to hide the undeposited and diverted cash from the accountants and IRS and that he knew exactly what he was doing, regardless of whether he looked at (or ever saw) the precise figures included on the corporate tax returns. The jury did not have to speculate to convict Dimitrios. Rather, they evaluated all the pieces of circumstantial and direct evidence and applied their common sense in putting the pieces of evidence together before

rendering a verdict that was consistent with the facts and the law.[12] Accordingly, defendant Dimitrios Zourdos' motion for acquittal as to Counts 9 through 15 should be denied.

## III.   RULE 33: A NEW TRIAL UNDER RULE 33 IS UNNECESSARY

The defendants seek a new trial under Rule 33, but there is no basis to grant this relief. Dimitrios argues that the evidence of his guilt was "marginal at best," Dkt. No. 107 at 17, while John and Helen claim that the "only way" the jury could have reached guilty verdicts against them would be if they "disregarded, in whole or in part, the Court's instructions as to the law," Dkt. No. 106-1 at 15. These claims merely reiterate the defendants' arguments regarding the sufficiency of the evidence and rely implicitly on the position, contrary to law, that all reasonable inferences should be made in the *defendants'* favor. However, the defendants have not pointed to any evidence or law that entitles them to a new trial. As briefed above and as the trial transcript makes clear, the government's evidence of the defendants' guilt on each count was strong, and there is no basis to believe "that an innocent person may have been convicted" here. *See McCourty*, 562 F.3d at 475. The defendants have also failed to show that a "manifest injustice" has occurred, as they do not (and could not) argue, for example, that the government's evidence of the defendants' guilt was "patently incredible" or "defies physical realities." *See Sanchez*, 969 F.2d at 1414. In short, the defendants' barebones motions for a new trial should be denied.

---

[12] Absent accomplice testimony or an admission or confession, willfulness in a tax case is rarely subject to direct proof and must generally be inferred from the defendant's acts or conduct. *See United States v. Collorafi*, 876 F.2d 303, 305-06 (2d Cir. 1989) ("Since bad faith and evil intent involve intangible mental processes, proof of willfulness usually must be accomplished by means of circumstantial evidence."); *United States v. Guidry*, 199 F.3d 1150, 1156-58 (10th Cir. 1999); *United States v. Kim*, 884 F.2d 189, 192 (5th Cir. 1989).

## **CONCLUSION**

For the reasons discussed above, the government respectfully requests that the Court deny the defendants' post-trial motions for judgment of acquittal and for a new trial in their entirety.