# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

*******************************

**UNITED STATES OF AMERICA**         Criminal No.: 5:20-cr-00298 (DNH)

     v.

**DIMITRIOS ZOURDOS,**

     **Defendants.**

*******************************

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING CONCERNING DIMITRIOS ZOURDOS

Dated:  June 27, 2022

          DAVID A HUBBERT
          Acting Assistant Attorney General

          */s/ John N. Kane, Jr.*
By:   JOHN N. KANE, JR.
          Assistant Chief
          U.S. Department of Justice, Tax Division
          Northern Criminal Enforcement Section
          Bar Roll No. 515130


          CARLA B. FREEDMAN
          United States Attorney

          */s/ Michael F. Perry*
By:   MICHAEL F. PERRY
          Assistant United States Attorney
          Bar Roll No. 518952

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 1

DISCUSSION ....................................................................................................................... 4

    I.    SENTENCING STANDARDS ............................................................................... 4

    II.    THE SENTENCING GUIDELINE CALCULATION ........................................... 5
        a.    Tax Loss ............................................................................................................ 5
        b.    Encouraging Others To Violate the Law ......................................................... 8
        c.    Total Offense Level and Guideline Range ...................................................... 10

    III.    SECTION 3553(a) FACTORS AND THE GOVERNMENT'S SENTENCING RECOMMENDATION ......................................................................................... 10
        a.    Nature and Circumstances of the Offense ..................................................... 10
        b.    History and Characteristics of the Defendant ............................................... 11
        c.    Deterrence ....................................................................................................... 11

    IV.    RESTITUTION ...................................................................................................... 14

CONCLUSION .................................................................................................................... 16

# INTRODUCTION

The United States of America, by and through the undersigned attorneys, submits this memorandum in aid of sentencing concerning defendants Dimitrios Zourdos.

Like his parents, Dimitrios demonstrated greed and arrogance during the course of this tax fraud conspiracy, and he continues to shift the blame to others without demonstrating any remorse for his crimes.

The seriousness of Dimitrios's tax crimes, the prolonged period over which he committed them, the fact that he continued the conspiracy even after one of the donut stores was audited and he and his parents were almost caught, the need for deterrence against tax crimes and those who would steal from the public purse and betray their most basic obligation of citizenship, and all of the sentencing factors suggest that Dimitrios Zourdos should receive a substantial term of incarceration for his crimes.

The Government therefore recommends a sentence of imprisonment within the sentencing guideline range of between 51 and 63 months.

# FACTUAL BACKGROUND

John Zourdos and his wife Helen Zourdos own and operate Dippin Donuts, a chain of three donut stores in Rome and New Hartford, New York, known as HZ Dippin, RDZ Dippin, and ERD Dippin. Defendant Dimitrios Zourdos, their adult son, actively participated in the management of the stores throughout the conspiracy period.

The evidence at trial proved beyond a reasonable doubt that between at least 2012 and 2017, John, Helen, and Dimitrios conspired to conceal approximately $4.5 million in cash receipts from the stores by diverting the cash receipts away from the stores' designated business bank accounts and stashing it in personal bank accounts or in a substantial cash hoard at John and Helen's home. The Zourdoses were able to conceal the diverted cash receipts by falsely informing

their accountant that they deposited all sales into the corporate bank accounts and then providing the accountants with just their business bank account statements and checks. As a result, the Zourdoses knowingly caused their accountants to file false individual and corporate tax returns that failed to report the stores' true receipts and the defendants' true income.

In addition, the evidence at trial showed that the Zourdoses conspired to operate an "off the books" cash payroll, thereby causing the payroll servicer to file false employment tax returns that underreported the wages paid.  By paying some of their wages under the table in this manner, the Zourdoses evaded federal employment taxes and encouraged their mainly younger employees to violate the law by not disclosing on their own tax returns the cash wages they had been paid.

The trial evidence showed that Dimitrios played a central role in the conspiracy and was instrumental in its success.  In addition to managing the Black River Boulevard store, Tr. 97:7-21; 150:8-151:5, and taking over the operation of all three stores when his parents were in Greece, Tr. 97:25-99:8; 125:11-126:1; 151:6-152:5; 245:16-246:8; 351:14-352:1; 357:8-13; 395:22-396:22; 420:8-421:2; 790:22-791:6, Dimitrios's handwriting was all over the calendar notebooks, which functioned as a second set of books not disclosed to accountants, *E.g.*, Tr. 360:7-362:21; 364:25-366:36; 801:3-804:10; Govt. Exs. 129-B; 130-A; 130-B.

Dimitrios also personally participated in diverting cash from the business, including by filling out deposit slips and making deposits into personal accounts (his own and those of family members). *See, e.g.*, Tr. 151:24-152:5; 253:4-13; 327:17-342:24; 789:2-15; Govt. Ex. 61-B at 27. A bank teller at NBT testified that Dimitrios made cash deposits to NBT accounts where his parents and his sister – but not him – had personal bank accounts. Tr. 328:23-329:9; 342:20-343:1; 346:17-22.  His diversions and cash deposits into his own accounts occurred on a regular basis, which is consistent with the weekly payroll maintained by Dippin Donuts, Tr. 991:24-993:14; Govt. Exs.

351-A; 351-B, while he helped his parents with their evasion scheme during their annual trips to Greece by making deposits to their accounts while they were away, *see* Tr. 346:17-22. Multiple witnesses testified that Dimitrios ran all three stores, including handling cash deposits and cash payroll, when his parents were in Greece. Tr. 97:25-99:8; 125:11-126:1; 151:6-152:5; 245:16-246:8; 351:14-352:1; 357:8-13; 395:22-396:22; 420:8-421:2; 790:22-791:6.[1]

The evidence at trial showed Dimitrios's greed in that he reported extremely low wages on his tax returns and paid virtually no tax between 2012 and 2017, *see* Trial Exhibit 20-B, while spending lavishly on his lifestyle, including on such items as a Rolex watch and the restoration of a 1963 Ford Galaxie.

In 2016, IRS Civil Examination audited RDZ Dippin for the 2014 tax year. Defendants initially did not turn over a set of calendar notebooks they maintained containing a record of true sales. Ultimately the notebooks were produced, but the defendants never explained – either to their accountants or to the IRS auditor – what the cryptic notations for each day meant. The defendants escaped the audit with no changes, but rather than cease their tax evasion, they continued their tax fraud, taking precautions so as not to be caught in the event they were ever audited again in that they altered the notebooks by adding decimal points to the sales figures to make them look substantially lower. Dimitrios helped maintain the doctored notebooks. *See* Tr. 366:15-367:5; 804:5-13; Govt. Ex. 130-B at 142.

---

[1] In fact, Dimitrios would deposit cash along with his paycheck, showing that he was receiving his pay in much the same way the employees did who got overtime pay under the table. *See, e.g.*, Tr. 991:9-994:15; Govt. Ex. 351-B. Dimitrios stopped making cash deposits (with one exception) after his mother was interviewed by IRS agents in late August 2017, Tr. 1020:23-1022:13; Govt. Ex. 365, and his on-the-books paycheck went up after that interview as well, Tr. 1020:23-1024:10.

3

The defendants' trial defense centered on blaming their prolonged and sustained willful tax evasion on their highly qualified and experienced accountants. Dimitrios's counsel argued that all the cash diversions he received were "gifts" from his parents, notwithstanding his full-time employment at the donut stores. The jury rightly rejected this false claim.

As a result of their egregious tax fraud conspiracy and scheme, defendants caused loss and harm to the United States Treasury of at least $2,000,769.

## DISCUSSION

### I.   SENTENCING STANDARDS

Factual findings at sentencing must meet the preponderance of the evidence standard. *See United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

In considering sentencing facts, courts have "largely unlimited" discretion "either as to the kind of information it may consider, or the source from which it may come." *United States v. Gomez*, 580 F.3d 94, 105 (2d Cir. 2009) (quoting *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir. 1996)); *see also United States v. Cacace*, 796 F.3d 176, 190-191 (2d Cir. 2015). So broad is this discretion that a sentencing court "'is entitled to rely on any type of information known to it,'" even information gleaned "'from a trial in which [the] person to be sentenced was neither a defendant nor represented by counsel.'" *Cacace*, 796 F.3d at 191 (quoting *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993)). "A sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal in determining sentence." *Sisti*, 91 F.3d at 312; *see also United States v. Broxmeyer*, 699 F.3d 265, 279-280 (2d Cir. 2012); *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978). "[I]t is well established that a district court need not hold an evidentiary hearing to resolve sentencing disputes, as long as the defendant is afforded 'some opportunity to rebut the Government's

4

allegations.'" *Broxmeyer*, 699 F.3d at 280 (quoting *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005)).

   II.   **THE SENTENCING GUIDELINE CALCULATION**

   a. **Tax Loss**

As the PSR highlights, U.S.S.G. § 2T1.9 (conspiracy to defraud) controls under the count of conviction grouping rules because it is the offense guideline that produces the highest offense level based on all the counts of conviction. U.S.S.G. § 3D1.3(b); PSR ¶ 34. Under section 2T1.9, the base offense level is determined first by looking to U.S.S.G. § 2T1.1 (Tax Evasion), which in turn begins with a computation of tax loss under section 2T4.1 (Tax Table).

Based on an analysis by Revenue Agent Michael Petrick, the tax loss is $2,000,769 resulting from the conspiracy in which Dimitrios was an active and important participant.[2] *See* Exs. 1-A through 1-G, at A-0001-0007 (Appendix of Exhibits).[3] RA Petrick computed loss at trial, but for sentencing, RA Petrick added as relevant conduct loss from tax years 2012 and 2017 caused by defendant's ongoing conspiracy and scheme to defraud as charged in Count One of the

---

[2] The Initial PSR calculates the tax loss as $1,825,072. RA Petrick has since discovered a calculation error for 2016. At trial, for 2016, he computed total unreported sales by treating the decimal points appearing in the notebooks as legitimate. But based on evidence at trial, including evidence from witnesses who confirmed that the true sales figures would not have contained the decimal points, RA Petrick updated his computation of unreported receipts by removing the decimal points. *See* Ex. 1 at A-0001. RA Petrick mistakenly failed to update his tax computation for 2016 based on this update, but now has. *See* Exs. 1-E and 1-F, at A-0005-06. In addition, while his initial computation gave defendants the benefit of a corporate tax deduction for the unreported wages and evaded taxes owed by Individual A as part of the same scheme, he mistakenly failed to add that additional component of income tax due and owing to his total tax loss computations, but now he has. *See* Exs. 1-D, 1-G at A-0004, 0007.

[3] References to exhibits and the appendix are in reference to the appendix submitted in support of the Government's sentencing memorandum concerning John and Helen Zourdos, which the Government incorporates by reference, in full, in support of its memorandum concerning defendant Dimitrios Zourdos.

5

Indictment. As he did during trial, RA Petrick computed loss by first computing unreported sales and receipts based upon the calendar notebooks that recorded true sales but were not disclosed to defendants' accountants. Ex. 1-A, at A-0001. RA Petrick then computed unreported sales based on the difference between the total sales recorded in the calendar notebooks and the sales disclosed on the corporate tax returns for HZ Dippin and RDZ Dippin. *Id.* He treated the unreported sales deposited into personal bank accounts as wages and then gave the corporations at issue (RDZ Dippin and HZ Dippin) tax deductions for those unreported wages, which reduced the taxes due and owing for the corporations. Exs. 1-B through 1-F, at A-0002-06. For the additional unreported sales that were not traced, RA Petrick treated those amounts as unreported dividend income, Exs. 1-B, which are not deductible at the corporate level. Exs. 1-E and 1-F, at A-0005-06. He then computed taxes due and owing for RDZ Dippin and HZ Dippin based on unreported sales (after allowing for additional deductions for wages), and the individual taxes due and owing for John, Helen, and Dimitrios based on unreported diversions. *See* Exs. 1-G at A-0007, 1-B through 1-F, at A-0002-06 (RA Petrick summary computations, taxes due and owing).

Defendant Dimitrios Zourdos does not dispute the calculations of unreported sales, or the calculation of diverted personal income. At trial, he, along with the other defendants, conceded the calendar notebooks reflected true sales. Instead, Dimitrios adopts his parents' argument claiming RA Petrick allegedly "double counted" taxes due and owing by treating the unreported, diverted sales as dividend income to John and Helen (which is not deductible at the corporate level). Defendants claim RA Petrick should have treated all the unreported, diverted sales as wage income, which would be tax deductible at the corporate level.

Defendants are incorrect. First, RA Petrick *did* treat a substantial portion of the unreported sales and diverted as wages, for which he gave a corporate tax deduction. *See* Ex. 1-B at A-0002

6

(*see* "Additions").[4] All of the unreported income of Dimitrios Zourdos was treated as wages (because he was not an owner and thus could not receive dividends), *see* Ex. 1-C at A-0003 – with an additional tax deduction applied at the corporate level. *See* Exs. 1-E and 1-F at A-0005-06. In addition, a substantial portion of John and Helen's unreported income, which could be traced to cash deposits in personal bank accounts, was treated as unreported wages, with a corresponding deduction at the corporate level. Ex. 1-B at A-0002. The additional unreported sales that were not traced (i.e., the cash hoard and the cash expenditures) were treated as dividends because that is precisely how the defendants treated these diversions in the real world: they did not withhold payroll taxes or issue Forms W-2 for these amounts. To the extent they now claim such amounts would have been treated as deductible wages at the corporate level had they elected to be law abiding citizens, they evaded income *and* payroll taxes on those alleged wages which would have been taxed at a higher rate than dividends.

Second, under the sentencing guidelines, defendants *are not* entitled to treat their dividends as deductible wages because those "under the table" payments facilitated a separate violation of the law, namely, violations of 26 U.S.C. § 7202 (failure to withhold and pay over employment taxes). U.S.S.G. § 2T1.1, app. n.3 ("However, the court shall not account for payments to third parties made in a manner that encouraged or facilitated a separate violation of law (e.g., "under the table" payments to employees or expenses incurred to obstruct justice"). In fact, RA Petrick was too generous: the guidelines permit no deduction. This makes intuitive sense because RA

---

[4] Under the section "Add," RA Petrick added the entire difference between the reported sales, and the total sales reflected in the calendar books. Exs. 1-E and 1-F at A-0005-06. Then he "added" a negative number – that portion of the different that were treated as deductible wages, namely, the amounts traced to personal bank accounts – effectively giving the corporations hundreds of thousands of dollars in tax deductions. *Id.*

7

Petrick's calculation *does not* include the tax loss from unreported payroll taxes (Social Security and Medicare taxes) that defendants evaded by diverting their own "under the table" wages into personal bank accounts.[5]

Accordingly, the base offense level under the guidelines should remain the same, at **level 22**. U.S.S.G. § 2T4.1(I) (loss between $1.5 and $3.5 million).[6]

### b. Encouraging Others To Violate the Law

U.S.S.G. § 2T1.9(b)(2) provides that a 2-level increase is added to the base offense level if "If the conduct was intended to encourage persons other than or in addition to co-conspirators to violate the internal revenue laws or impede, impair, obstruct, or defeat the ascertainment, computation, assessment, or collection of revenue." Application Note 4 explains: "Subsection (b)(2) provides an enhancement where the conduct was intended to encourage persons, other than the participants directly involved in the offense, to violate the tax laws (e.g., an offense involving a "tax protest" group that encourages persons to violate the tax laws, or an offense involving the marketing of fraudulent tax shelters or schemes) . . . additional specific offense characteristics are included because of the potential for these tax conspiracies to subvert the revenue system and the danger to law enforcement agents and the public". *Id.* app. n.4; *see United States v. Macchia*, 1996

---

[5] RA Petrick ran a separate calculation, consistent with the guidelines, excluding unreported wages as a deduction because such payments facilitated another violation of the law. *See* Exs. 2-A through 2-F at A-0008-0013 (Scenario 2). The resulting tax loss is $2,835,975. Ex. 2-F at A-0013.

[6] Defendants' claim that all unreported sales should be treated as compensation and wages is not supported by the evidence. By their own analysis, that would make the Dippin Donut stores unprofitable because of the exorbitant wage and salary expenses paid to the stores managers – according to defendants' claim, over $700,000 in annual compensation to run donut and coffee stores. In fact, Dippin Donuts was highly profitable – with those profits inuring to its owners in the form of dividends. Accordingly, RA Petrick's calculations, set forth in the PSR, appropriately treats a substantial portion of the unreported sales as wages, but recognizes a remaining portion paid out as dividends from the profits of the Dippin Donut stores.

WL 518509 (2d Cir. 1996) (U.S.S.G. § 2T1.9(b)(2) not limited to cited examples, but applies to other examples of encouraging others to violate the law); *United States v. Rosario*, 7 F.3d 319, 320–21 (2d Cir.1993); *see also United States v. Garrett*, 1994 WL 280048, at *1 (N.D. Ill. 1994) (noting that "the two examples offered in the commentary to § 2T1.9 are not exhaustive").

The testimony and documents at trial proved that defendants paid a portion of their payroll in cash "under the table." Several employees testified to that fact. Defendants did not include the cash amounts in the Forms W-2 and knew the employees would have no record of the wages to take to their accountant. The fact that they paid employees using cash was itself a way for them to help their employees conceal these wages and violate the law. Whitney Sykes testified that John Zourdos told her that "he was doing us a favor by giving us the extra money in our cash instead of claiming in on our taxes." Tr. 139:2-13. Helen Zourdos similarly told Angela Layman to just take her W-2 to her tax preparer, Tr. 425:1-12, even though Helen would have known that the W-2 did not capture Layman's cash overtime wages. As for Dimitrios, in addition to managing the Black River Boulevard store, Tr. 97:7-21; 150:8-151:5, and taking over the operation of all three stores when his parents were in Greece, Tr. 97:25-99:8; 125:11-126:1; 151:6-152:5; 245:16-246:8; 351:14-352:1; 357:8-13; 395:22-396:22; 420:8-421:2; 790:22-791:6, current and former employees testified that they were paid their overtime hours in cash and that no taxes were taken out of the cash wages they received from management, including at times from Dimitrios. *See* Tr. 99:23-104:3 (Brittany Labuz); Tr. 138:18-139:24 (Whitney Sykes); 348:12-358:5 (Shane McRae); 400:8-402:16 (Catalina Lyness); 422:18-424:15 (Angela Layman); 757:13-758:22 (Tyler Falcone).

Having followed the defendants' lead, these and other employees required immunity to testify at trial, as they did not claim their cash wages as income (which is what the defendants

9

encouraged and anticipated). Accordingly, the PSR rightly calculates an additional 2-point enhancement under this guideline provision. PSR ¶ 36.

### c. Total Offense Level and Guideline Range

The Government agrees with the PSR's computation of Dimitrios' total offense level as 24, which results in a guideline range of 51 to 63 months of imprisonment. PSR ¶ 65.

### III. SECTION 3553(a) FACTORS AND THE GOVERNMENT'S SENTENCING RECOMMENDATION

#### a. Nature and Circumstances of the Offense

As set forth in the factual background section, the defendants' tax evasion scheme and conspiracy, extending over at least six (6) years if not longer, was egregious and resulted in substantial tax harm to the United States. Dimitrios was a grown adult over 30 years of age when these crimes were committed and when he decided to violate the law and his obligations as a citizen.

But the Court should consider, as when considering the sentencing of his parents, at least two additional points with respect to Dimitrios' conduct. First, Dimitrios's demonstrated greed. Dimitrios reported extremely low income compared to the substantial wages he received and concealed. During the years at issue, Dimitrios never reported more than $25,000 in wages (in most years much less than this), all while funding a lavish lifestyle with millions in concealed income, including spending $26,000 to restore a 1963 Ford Galaxie, not to mention his clothes, his Rolex watch, and his Morgan Stanley investment accounts, ultimately resulting in a net worth of more than $1 million. *See* PSR ¶ 62.

Second, Dimitrios, like his parents, refused to heed the warning sign, in the form of the 2016 IRS civil audit, to get right with the law. Instead of ceasing their fraudulent activity, they were emboldened and arrogantly continued their fraud, including by doctoring their books and

10

records in such a way to conceal their true sales if ever they were audited again. Indeed, Dimitrios's handwriting was all over the calendar notebooks, including the entries where the sales figures were doctored with decimal points after the audit in an evident attempt to conceal the amount of sales the stores were earning. Tr. 366:15-367:5; 804:5-13; Govt. Ex. 130-B at 142.

The Court should consider these facts, and the true nature and circumstances of his crimes, when imposing Dimitrios's sentence.

b. **History and Characteristics of the Defendant**

The PSR notes that Dimitrios Zourdos, age 39, born in the United States, was reared in a stable two-parent home with wealth, and received a free public education at Oriskany High School – funded by honest, taxpaying citizens. While he struggled with certain learning disabilities as a child, those were resolved. He went on to receive a college degree from Utica College with bachelor's degree in secondary education, holding a grade point average of between 3.2 and 3.6.

In short, Dimitrios Zourdos was a grown, educated, privileged adult when he committed tax evasion. He should have known better, and did know better, but he nonetheless deliberately chose the path of tax fraud against the United States.

c. **Deterrence**

The Government respectfully urges this Court to send a clear message with this case to those contemplating tax evasion. Such a message is the paramount goal of criminal tax enforcement.

The Court must consider in imposing sentence under Section 3553(a) the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). General deterrence is particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. A recent IRS study of tax compliance

estimates that only 83.1% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016, *available at* www.irs.gov/pub/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf. This means that hundreds of billions of dollars are lost every year because people like the defendants – who otherwise fully enjoy the myriad public benefits that the tax system supports – choose to shirk their responsibilities as taxpayers. Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing sentence.

Put bluntly, meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect."); W. Boning, J. Guyton, R. Hodge, & J. Slemrod, *Heard it through the Grapevine: The Direct and Network Effects of a Tax Enforcement Field Experiment on Firms*, Journal of Public Economics 190 (2020) ("The effects of tax enforcement directed at one taxpayer are not limited to that taxpayer's behavior. Increased enforcement deters evasion . . . by changing taxpayers' perceptions of the probability that evasion will be detected and punished").

The importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax

> prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt. Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

The need for general deterrence is greatest in cases involving particularly lucrative and difficult-to-detect tax fraud schemes. *See United States v. Zukerman*, 897 F.3d at 429 (general deterrence "has a particularly important role" due "to the significant resources required to monitor and prosecute tax crimes," which "cost the government hundreds of billions of dollars annually"; quoting and finding "eminently reasonable" district court's findings with respect to deterrence). Thus, to provide adequate general deterrence, sentences for multi-year tax fraud schemes must be substantial.

Judge Weinfeld aptly observed, in a pre-Guidelines setting, the important deterrent value of incarceration in tax cases:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment. The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns. I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to, other people in the community.

*United States* v. *Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13); *see also United States* v. *Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path."); *see also* Sentencing Tr., *United States* v. *Joseph Ciccarella*, 16 Cr. 738 (AKH),

13

at 22-23 (attached hereto as Exhibit 3 at A-0036-37) (explaining within-Guidelines tax sentence of imprisonment for first-time 54-year-old tax offender; "If people don't pay their taxes, they cheat each other. You're not paying taxes cheats me. If I don't pay my taxes, I cheat you. . . . You're ripping off everybody else by not paying your share of taxes."); *United States v. Jeffrey Stein & Marla Stein*, 15 Cr. 195 (DLC) (July 31, 2015; Tr. at 7-8) (attached hereto as Exhibit 4 at A-0047-48) (justifying prison sentence as to well-educated first-time offenders because "of the deceit, the disloyalty shown to a household employee and to an accountant, [and] their irresponsibility as citizens," as evidenced by their tax fraud).

In short, compliance with the Internal Revenue Code will be unattainable if the general public believes there are no meaningful repercussions for failing to comply with the tax laws. Sentencing Dimitrios Zourdos to a within-Guidelines term of incarceration is, therefore, necessary to send the message to others in our society that systematic and repeated efforts to cheat on one's taxes will be met with serious punishment.

This country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status. That system of voluntary compliance would crumble if taxpayers believed they could cheat with impunity or that the sanctions they would face when caught would not be severe.

## IV. **RESTITUTION**

The Court must impose an order of restitution pursuant to 18 U.S.C. §§ 3663, 3663A, as Dimitrios Zourdos was convicted of violating 18 U.S.C. § 371 (conspiracy to defraud). Reasonable estimates of restitution are permitted. *United States v. Salas-Fernandez*, 620 F.3d 45, 48 (1st Cir. 2011) (noting that in determining amount of restitution, "a sentencing court is not held to a standard of absolute precision" and "[a] 'modicum of reliable evidence' will suffice") (citations omitted);

*see also United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007) (affirming restitution order, noting that the court below, "acting within its broad discretion to determine restitution, properly employed this measure, and, based on the evidence before it, made a reasonable estimate of the amount of lost sales").

The amount of restitution the Government seeks is the tax harm caused to the U.S. Treasury by defendants' conspiracy to defraud the United States, namely, $2,000,769.[7] To date, Dimitrios Zourdos has not paid any of the taxes he owes. The Government is also entitled to prejudgment interest on the amounts due for each year. *See United States v. Adams*, 955 F.3d 238, 251-52 (2d Cir. 2020) (prejudgment interest properly included in restitution order because it "is part of the government's loss when delinquent taxes are not timely paid").[8]

The Government will present the Court with a proposed order directing the payment of the back taxes and interest. We request that the Court's order of restitution specifically break down the amount owed for each year, as follows:

| Tax Year | Taxes Due | Interest | Total by Year |
|---|---|---|---|
| 2012 | $323,404 | $133,846 | $457,250 |
| 2013 | $282,017 | $105,344 | $387,361 |
| 2014 | $319,449 | $106,547 | $425,996 |
| 2015 | $441,388 | $129,070 | $570,458 |
| 2016 | $471,036 | $113,148 | $584,184 |

---

[7] Defendants must pay restitution for the losses "directly and proximately" caused by the conspiracy at issue, which here includes losses from the years 2012 and 2017 which were caused by the same, ongoing conspiracy using the same manner and means. *United States v. Goodrich*, 12 F.4th 219, 231 (2d Cir. 2021); *see also United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000); *United States v. Desnoyers*, 708 F.3d 378, 390 (2d Cir. 2013) (holding that restitution order should have included payments that "were necessary to the overall scheme even though neither was integral to the offense of conviction").

[8] While the Court may assess interest in computing restitution, the Court may not consider such interest when computing tax loss under the Sentencing Guidelines. *See* U.S.S.G. § 2T1.1 (Application Note 1).

15

| 2017 | $163,475 | $30,427 | $193,902 |

The Government further requests that the Court issue a restitution order holding all three defendants, John, Helen, and Dimitrios Zourdos, jointly and severally liable for the aforementioned amounts.

## CONCLUSION

For the foregoing reasons, the Government respectfully urges the Court impose a substantial term of incarceration for Dimitrios Zourdos, within the applicable guideline range.

Dated:  June 27, 2022

Respectfully submitted,

DAVID A HUBBERT
Acting Assistant Attorney General

By: */s/ John N. Kane, Jr.*
JOHN N. KANE, JR.
Assistant Chief
U.S. Department of Justice, Tax Division
Northern Criminal Enforcement Section
Bar Roll No. 515130

CARLA B. FREEDMAN
United States Attorney

By: */s/ Michael F. Perry*
MICHAEL F. PERRY
Assistant United States Attorney
Bar Roll No. 518952